UNITED STATES of America

v.

Dwight L. CHAPIN, Appellant.

No. 74–1648.

United States Court of Appeals,
District of Columbia Circuit.

Argued Feb. 7, 1975.

Decided July 14, 1975.

Jacob Stein, Washington, D. C., with whom Gerard E. Mitchell, Washington, D. C., was on the brief for appellant.

Richard D. Weinberg, Asst. Sp. Prosecutor, with whom Leon Jaworski, Sp. Prosecutor, at the time the brief was filed, Philip A. Lacovara, Counsel to the Sp. Prosecutor, at the time the brief was filed and Richard J. Davis, Asst. Sp. Prosecutor, was on the brief for appellee.

Before WRIGHT and LEVENTHAL, Circuit Judges, and DAVIS,* Judge.

Opinion for the Court filed by Judge DAVIS.

---

* Of the United States Court of Claims, sitting by designation pursuant to 28 U.S.C. § 293(a) (1970).

DAVIS, Judge:

Following a jury trial, appellant Dwight L. Chapin was convicted of two counts of making "false material declarations", 18 U.S.C. § 1623 (1970), before the grand jury investigating "dirty tricks" engaged in by Donald Segretti on behalf of President Nixon during the 1972 Presidential campaign. Specifically, appellant was convicted of falsely stating that he was not "familiar with" any distribution of campaign literature by Segretti, and that he did not recall "express[ing] any interest . . . or giv[ing Segretti] any directions or instructions with respect to any single or particular candidate." [1] The Government's contention, which the jury accepted, was that appellant did in fact know of distributions of literature by Segretti, was aware of this knowledge when he testified before the grand jury, and yet falsely responded that he was not familiar with any such distribution. On the second count on which appellant was convicted, the prosecution theory was that Chapin had given Segretti specific instructions about Senator Edmund Muskie, that Chapin understood the question to refer to such instructions, and remembered at the time of his grand jury appearance having given such instructions. On appeal, appellant claims that the "distribution" question was vague, and that he answered it truthfully because he was not in fact familiar with any "personal distribution" by Segretti, in the sense of passing out literature on street corners. Chapin also asserts that the second question was compound and therefore improper and likewise vague, and that again he answered truthfully in that he never gave directions about one candidate to the exclusion of all others. Appellant also claims error in the trial court's admission of certain evidence and that court's failure to grant a change of venue or to conduct a thorough enough voir dire.[2]

## I.

Chapin was Appointments Secretary to President Nixon from the start of the President's term in January 1969 until March 1973. While his duties in that position were largely administrative, he also participated in political activities, particularly during the President's 1970 campaign for Congressional candidates. In 1971, Chapin conceived the idea of hiring someone to play "political pranks" on the various contenders for the Democratic Presidential nomination for 1972, with the aim of creating so much dissension among the candidates that they would not be able to unite effectively behind the party's nominee after the convention. The proposal received the approval of White House Chief of Staff H. R. Haldeman, who insisted however that no such activities be traceable back to the White House. Armed with Haldeman's approval, in the summer of 1971 Chapin hired Donald Segretti, a college friend just leaving the Army Judge Advocate Corps, for this job. Chapin instructed Segretti about the types of activities he was to engage in, using examples of having a train pull out of the station while a candidate was still talking and distributing false baggage calls, and warned him to do as little as possible himself and to use false names so as not to have his work attributable to the White House.

During the last part of 1971 and the first half of 1972, Segretti engaged in such disruptive activities as printing and distributing large posters saying "Help Muskie Support Bussing (sic) More Children Now," supposedly distributed by

1. Chapin was also indicted for testifying falsely as to his knowledge of the arrangements for paying Segretti, and his advice to Segretti when the latter was called by the FBI. The trial court dismissed the financing count at the close of the government's case, and the jury acquitted Chapin on the FBI count. The jury also acquitted Chapin on a subpart of the "distribution" count in which it was alleged that defendant falsely stated that he had not discussed with Segretti the distribution of campaign literature.

2. Chapin was sentenced to two concurrent terms of from ten to thirty months imprisonment.

the Mothers Backing Muskie Committee; writing a letter on Citizens for Muskie stationery accusing Senator Jackson of being a homosexual and Senator Humphrey of cavorting with prostitutes at the expense of lobbyists; and putting out a "Humphrey" press release stating that Representative Shirley Chisholm had been committed to a mental institution in the early 1950's after being detained in Richmond, Virginia as a transvestite and that she was still under psychiatric care. While it is undenied that Chapin had nothing to do with the exact "pranks" to be played and saw none of the items mentioned above before Segretti used them, it is also clear that the latter regularly sent copies of his output to Chapin at home and that Chapin was aware of at least these documents shortly after they were used.

After the burglary at the Democratic National Committee headquarters in the Watergate office building was discovered on June 17, 1972, Chapin immediately instructed Segretti to cease his activities and to "get lost." The Segretti-Chapin project had been conducted solely out of the White House and not from the Committee to Reelect the President, the home base of the "Watergate" burglars. However, Segretti's activities had induced G. Gordon Liddy, one of those arrested in connection with the Watergate break-in, to check him out, and as a result Liddy's address book contained Segretti's name. In late June, Segretti was interviewed by the FBI. On the advice of John Dean, Counsel to the President, Segretti discussed generally what he had been doing but did not disclose that Chapin had hired him. In August 1972, Segretti was called before the Watergate grand jury. As with the FBI interview, on Dean's advice he attempted to avoid naming Chapin as his employer. However, in response to a question by a juror, Segretti admitted that he had been retained by Chapin. Chapin was concerned about his possible legal liability for Segretti's activities and consulted with Dean who thought Chapin's only "problem" would be with the federal campaign act provisions on attribution of campaign literature. Newspaper reports of Chapin's connection with Segretti were published beginning October 10, 1972, but were denied by the White House. Segretti was indicted in May 1973 for distributing the Jackson-Humphrey "sex letter" without proper attribution.

Between August 1972 and February 1973, Chapin was himself interviewed three times by the FBI concerning his relationship with Segretti. According to the testimony of the agent who saw him, Chapin admitted knowledge of some of Segretti's more minor "antics", but denied ever receiving any of the latter's documents and denied knowing, before the FBI began its investigation of Segretti, that Segretti had published false information about various candidates. Chapin testified at the trial that his denials were in fact false, but that he had been less than truthful because he was concerned, particularly at the time of the February meeting, that FBI interviews were being leaked to the press.

In April 1973, John Dean began talking to the Watergate prosecutors about the burglary itself and attempts to cover up both that episode and some earlier activities on behalf of the President. On April 11, 1973, Chapin appeared before the grand jury investigating campaign law violations. Questioning centered around Segretti's activities, the role of people in the White House in sponsoring and approving what Segretti had done, and how Segretti was paid and by whom. Chapin testified that he had gone into the grand jury intending to keep secret the fact that Haldeman had approved the plan, but denied any intent to limit his testimony on any other aspect of the inquiry. Under prodding, Chapin did eventually reveal Haldeman's role. However, appellant stands convicted of falsely answering questions in two other areas. He was found guilty of giving the untrue responses emphasized in the following exchanges:

1. Q. To your knowledge did Mr. Segretti ever distribute any state-

ments of any kind, or any campaign literature of any kind?

A. *Not that I am familiar with.*

2. Q. What candidates do you recall receiving information about? Senator Muskie—was he one?

A. Yes. I think virtually Muskie and Humphrey, Wallace.

Q. Senator McGovern?

A. Jackson, McGovern. I think virtually all of them. I forget now who all the candidates were. I think that covers it.

Q. At one time or another during this period of time, in the early months of 1972, you received information from Mr. Segretti relating to all these candidates?

A. As I recall, two of them may be mentioned in one little note or something. But they were not documents or reports—what you and I would consider reports.

Q. Did you ever express any interest to him, or give him any directions or instructions with respect to any single or particular candidate?

A. *Not that I recall.*

## II.

Appellant's first argument for reversal is that the two questions form improper bases for a perjury indictment in that they are so vague and ambiguous that only "[b]y groundless surmise . . . could the jury determine which definition [of the crucial words] defendant had in mind" when he responded. United States v. Lattimore, 127 F.Supp. 405, 409 (D.D.C.), aff'd, 98 U.S.App.D.C. 77, 232 F.2d 334 (1955). Specifically, appellant claims that the words "distribute" and "express any interest" are subject to a number of possible interpretations, any one of which someone in Chapin's position might have reasonably understood to be that the questioner intended. Since, appellant contends, a proper perjury prosecution requires that the

government prove that the defendant knowingly answered falsely the question as he understood it, a vague question requires too much speculation by the jury as to the meaning the accused gave it when he answered.

The *Lattimore* case is the only one we have seen in which a perjury indictment was dismissed for vagueness in the question (and the dismissal upheld on appeal) —appellant's other cases go to the government's failure to prove which meaning was in the defendant's mind while conceding that, on proper proof, the convictions could have stood up. *See* United States v. Wall, 371 F.2d 398, 400 (6th Cir. 1967); United States v. Diogo, 320 F.2d 898, 907 (2d Cir. 1963). *Lattimore* involved extreme questions which were both vague and highly charged with First Amendment problems. No one would doubt that proceeding against someone for falsely stating that he was not a "sympathizer or any other kind of promoter of Communism or Communist interests" or a "follower of the Communist line," particularly in an era when the definition of Communist was expanded in the eyes of many, raised the most serious of First Amendment issues—having as it does, a close relationship to prosecuting that person for holding political beliefs. *Cf.* Dennis v. United States, 341 U.S. 494, 501–02, 71 S.Ct. 857, 95 L.Ed. 1137 (1951) (plurality opinion).

■ While it may be that some questions without First Amendment overtones may be so vague as to prohibit the government from even attempting to prove that the defendant knowingly answered falsely, the words of which defendant complains here do not fall into that category. As another court stated when faced with the charge that "met with" and "regular" were too vague, "mere vagueness or ambiguity in the questions is not enough to establish a defense to perjury. Almost any question or answer can be interpreted in several ways when subjected to ingenious scrutiny after the fact." United States v.

Ceccerelli, 350 F.Supp. 475, 478 (W.D. Penn.1972); *see* United States v. Lattimore, *supra,* 127 F.Supp. at 410 n. 21. When the questions involved here are considered in the context of both the purpose of the grand jury investigation, which was known to Chapin, and the series of questions actually asked, we cannot say that the words involved could not be "subject to a reasonable and definite interpretation by the jury." United States v. Marchisio, 344 F.2d 653, 662 (2d Cir. 1965).[3]

Next, defendant says that, even if the questions were sufficiently definite to support an indictment, the evidence was inadequate to prove that Chapin falsely answered the questions as he understood them. The charge instructed that the defendant could not be found guilty "unless it has also been shown beyond a reasonable doubt that the Defendant at the time he answered knew the answer to be false. This is basically a matter of what was in his mind, his intent." (Tr. 742)[4] Three preliminary observations are appropriate. First, appellant received the benefit of a jury charge based on the so-called objective theory of perjury—that, if the answer he gave was true under any reasonable interpretation of the question, the jury could not convict. We need not decide, therefore, whether a conviction would be upheld if the government proved that the defendant was truthfully answering some possible-and-reasonable interpretation of the question but falsely answering the question as he himself interpreted it.

█ Second, the possibility that a question or an answer may have a number of interpretations does not invalidate either an indictment or a conviction after a jury charge which, as here, requires the jury to determine that the question *as the defendant understood it* was falsely answered in order to convict. Despite appellant's argument, the *Wall* and *Bronston* cases are not contrary. In *Wall,* the interpretation argued for by the defendant was in fact more reasonable and usual than that urged by the government. The defendant had answered "I have not." to the question "Have you ever been on trips with Mr. X?" The evidence showed that, while Wall had been in Florida with Mr. X, she had not travelled with him to Florida. Since the government did not prove that Wall interpreted the question when it was asked in the first sense rather than the more usual second meaning, the conviction was reversed. United States v. Wall, *supra,* 371 F.2d at 400. In *Bronston,* the Court dealt with a statement literally true but unresponsive to the question asked. The Court explicitly considered only the problem posed by a declarative statement which was true no matter what the question might have meant, and did not consider the effect of any possible vagueness of the question. Bronston v. United States, 409 U.S. 352, 356–57, 93 S.Ct. 595, 34 L.Ed.2d 568 (1973). *Bronston* does not deal with the situation where a defendant has given a "yes or no" answer, the truth of which can be ascertained only in the context of the question posed.

█ Third, perjury cases, like all criminal cases, are susceptible to proof by circumstantial evidence, and in fact are peculiarly likely to be proven in this manner because one of the elements of the crime is that the defendant knew his statement was false when he made it. *See* Young v. United States, 94 U.S.App. D.C. 54, 212 F.2d 236, 241 (D.C.Cir.), cert. denied, 347 U.S. 1015, 74 S.Ct. 870, 98

**3.** See the following decisions in which questions challenged as ambiguous were upheld as sufficient to support an indictment or a conviction. Seymour v. United States, 77 F.2d 577 (8th Cir. 1935) ("encouraging the candidacy"; defendant contended he interpreted the question as asking whether he had personally influenced the candidacy, which he had not; conviction sustained); United States v. Laroc-ca, 245 F.2d 196 (2d Cir. 1957) ("anything to do with this business"; indictment reinstated); United States v. Bergman, 354 F.2d 931 (2d Cir. 1966) ("kickback"; conviction sustained although evidence showed kickback not paid directly to defendant).

**4.** No part of the charge-to-the-jury is challenged on this appeal.

L.Ed. 1137 (1954); Gebhard v. United States, 422 F.2d 281, 287–88 (9th Cir. 1970); Behrle v. United States, 69 App. D.C. 304, 100 F.2d 714, 715–16 (1938). It was not necessary for the government to bring forth an admission by Chapin as to what he thought the question meant at the time he answered it in order for the jury to make that determination.

■ In the light of these considerations, we take up the two questions. As to the first, Chapin maintains on appeal that he thought the questioner was interested in whether he knew that Segretti had *personally* distributed any campaign literature, in the sense of passing it out on a street corner or from house to house. While Segretti testified at the trial that he actually had, contrary to Chapin's instructions, passed things out to "consumers" directly, he also stated that he had not told Chapin of these instances, and there was no indication that Chapin had found out about them otherwise. Under the meaning appellant now puts forth, his response was true. However, we cannot reverse the jury's verdict on this theory.[5]

Segretti testified during the government's case in chief that he and Chapin had discussed several items which Chapin knew Segretti had started through usual distribution channels. (Since Segretti often issued false press releases or baggage calls rather than flyers, as Chapin well knew, the items would in no event have to be passed out on street corners in order to be effectively distributed.) For example, Segretti testified that, with respect to the Jackson-Humphrey letter, "Mr. Chapin inquired how much it had cost me to have this letter distributed and I told him $20.00. He stated that for that amount of money I received ten or fifteen or twenty thousand dollars worth of free publicity and

he told me to be careful that I didn't get caught." (Tr. 307). He also testified as to his discussion with Chapin about the printing of the large Day-glo orange Muskie busing poster (Tr. 288). The Government introduced, through John Dean, an "Eyes Only" memorandum written by Chapin on November 5, 1972, before his grand jury appearance, in which Chapin stated that "It is my feeling Don did the 'Sex News Release' on Jackson and Humphrey and tried to tie it to Muskie's people. . . . He also put out countless press releases about events—scheduled and non-scheduled. . . . I believe it was Don who had [pro-Muskie] cards passed out at Wallace rallies." (Joint Appendix 342–43) The Government showed Chapin's motive to lie about the question through Dean's testimony that he had told Chapin that the latter's only possible criminal liability was for "causing to be distributed" non-attributed campaign literature (Tr. 421) *see* 18 U.S.C. § 612 (1970), and through proof that Chapin had lied on the same subject to the FBI (Tr. 444, 447). Chapin's grand jury testimony itself, introduced as Government's Exhibit 1, showed that while appellant readily admitted innocuous "pranks," he steadfastly refused to admit any knowledge about the one item—campaign literature—he feared could lead to his prosecution. The grand jury testimony also contains Chapin's own use of the word "distribution" in a context which does not involve passing items out at street corners. (G. Ex. 1 at 27) These items, coupled with the fact that the usual meaning of the word "distribute" is simply to pass on to others, which Chapin clearly knew Segretti did, were certainly sufficient so that a reasonable juror could have fairly found, beyond a reasonable doubt, that Chapin knew that the true answer to the question as asked, at the time it was asked, was "yes",—

---

**5.** Appellant has argued that the jury's acquittal on the "discussed the distribution" part of Count I necessarily requires acquittal on the "know about the distribution" part of the count. This position totally ignores the possi-

bility that Chapin could have found out about Segretti's activities in any number of ways other than by discussing them with Segretti—notes from Segretti, the press, statements of others.

and that he wilfully lied. *See* Curley v. United States, 81 U.S.App.D.C. 389, 160 F.2d 229, 232 (1946), cert. denied, 331 U.S. 837, 67 S.Ct. 1511, 91 L.Ed. 1850 (1947).

Chapin's defense, if anything, further undermined his case. He admitted his concern with possible criminal liability for the distribution of campaign literature, and his "misstatements" to the FBI on that subject. He also stated that he knew that Segretti did not keep the items he produced to himself and that several of them had become widely publicized. Most important, while he was never asked what he thought this question had meant during the grand jury hearing, Chapin did provide the court with his own definition of distribution— "the method by which something goes from the point of production to the hands of the consumer. It deals with the channels by which it goes, the economics of how it is handled, how it is merchandized, that kind of a context." (Tr. 553) While Chapin also denied the statement to Segretti about the Jackson-Humphrey release, the totality of the evidence at the close of the testimony was strong enough to require the judge to send the case to the jury. On this basis, the jury's verdict on Count I must stand.

■ Defendant attacks Count III (the "single or particular candidate" question) on three grounds in addition to the vagueness argument discussed above.[6] First, he says that the question was an improper compound question, asking whether Chapin had ever expressed an interest *or* given any instructions or directions, and that the government failed to prove which question Chapin answered. We note first that this argument is new on appeal—in the District Court, Chapin consistently treated the question as a single entity. His entire defense on this count related to his understanding that the questioner wanted to know whether Chapin had focused his atten-

tion on one candidate to the exclusion of others. He made no effort, from pre-trial to his closing argument to the jury, to indicate that he might have been confused about which question to answer. And Chapin made no mention of this possibility in his own testimony. He did not, finally, request a jury instruction which would have specifically required the government to prove which branch of the question he was answering.

An examination of the question lends support to this original position. The question here asks for only one bit of information; using two analogous phrases in the same question was nothing more than a rhetorical flourish. In this situation, especially where the jury charge emphasized the requirement that the government prove that the defendant knew his answer was false when he gave it (necessarily requiring the jury to determine what question the defendant thought he was answering), we cannot say that there was impermissible speculation on the jury's part when it decided that Chapin knowingly responded falsely.

■ Second, Chapin argues that the evidence was insufficient to prove that he answered the question falsely. Proceeding from his vagueness argument, appellant states that the question meant to him, at the time posed, "Did you express any interest or give any directions or instructions with respect to a single or particular candidate *to the exclusion of all others* ?" As with Count I, it is clear that Chapin had not given such instructions and that if this were in fact the meaning Chapin had given to the question, his answer was true. It was, however, shown by the Government in its case in chief that Chapin did at various times single out Senator Muskie as someone for Segretti to particularly concentrate on. For example, Segretti testified that at one of their first meetings, "He [Chapin] told me that Senator Muskie was the one that I should concern myself

---

6. As indicated *supra,* "express any interest to him" or "give him any directions or instructions" are not too vague in themselves to be a

predicate, in the context, for a jury's finding that appellant knowingly gave a false answer.

with primarily . . ." (Tr. 228) In addition, Segretti said, Chapin suggested several trips and engagements of Muskie which Segretti was to cover, and also requested that "it would be a good idea to perhaps get a rather disheveled looking individual and have him hold a sign [at a Nixon rally] that said something to the effect, 'Muskie for President.'" (Tr. 236). Of the three pieces of written instructions Chapin sent Segretti during the entire time he was operating, two dealt with suggestions on how to handle Senator Muskie. Finally, Segretti testified that he felt it necessary to ask Chapin in March 1972 whom he should concentrate on now that Muskie was no longer the front runner. He was told to "concentrate [his] efforts towards fostering a split between the staff or the candidates of Senator Humphrey and Senator Muskie." (Tr. 320–21) The only thing the defense brought out in cross-examining Segretti was that the overall plan had been to foster dissension; the specific instances of instructions about Senator Muskie were not denied.

At the close of the Government's case, then, the issue was whether Chapin's version of the question, in context, was reasonable enough that a jury would be left to speculate on which meaning of the question Chapin had in mind and so would be unable to determine whether he had knowingly answered the question falsely. *See* United States v. Wall, *supra,* 371 F.2d at 400. The placing of the question is important in this connection. The particular inquiry came at the close of a series of questions about reports he had received from Segretti, and he had stated that he had received information about all the Democratic contenders. Earlier in his grand jury statement, Chapin had described Segretti's assignment as doing "competitive checks on various possible presidential candidates during the primary season." With the grand jury questioning in that posture, a jury could find that the specific question at issue could not have reasonably been interpreted to ask whether Chapin had countermanded the prior orders to harass

all the candidates, but that its purpose was rather to determine Chapin's role in some of the better-known "pranks" of that campaign, which were largely directed toward Muskie. If Chapin, knowing full well that Segretti was to torment all the Democratic candidates and that the questioners knew that too, really thought that this particular question suddenly asked whether the plan had been to "zero in" on one candidate to the exclusion of all others, he would not have responded so equivocally as he did, "Not *that I recall*" (emphasis added), but would probably have given a flat and emphatic negative. This was too central a matter not to be clear in his mind. *See* Behrle v. United States, *supra*; Gebhard v. United States, *supra*; United States v. Nicoletti, 310 F.2d 359, 361–63 (7th Cir. 1962), cert. denied, 372 U.S. 942, 83 S.Ct. 935, 9 L.Ed.2d 968 (1963). Giving the benefit of inferences to the government, Curley v. United States, *supra,* 160 F.2d at 232, it is fair to say that the prosecution had sufficiently shown that Chapin's answer was knowingly false under the only reasonable interpretation of the question—that it asked for information about directions about and interest in a specific candidate while recognizing that the overall plan was to create dissension among all candidates.

▮▮▮▮ In defense, Chapin stated that his thought when he answered the question was "only that there was no master plan against any particular candidate that Mr. Segretti dealt with. That was the only thing." (Tr. 513). The defense also emphasized that there had been no followup questions dealing with specific candidates, but this could mean that the prosecutors were successfully misled by Chapin rather than that the question dealt only with whether the original plan had been changed. As the court pointed out in *Lattimore,* neither the court nor the jury must accept as conclusive the meaning the defendant, after the fact, puts on a question. *Lattimore, supra,* 127 F.Supp. at 410 n. 21; *see* Seymour v. United States, *supra,* 77 F.2d at 584; United States v. Ceccerelli, *supra,* 350

F.Supp. at 478. Particularly when the entire case revolves around an assessment of defendant's credibility, we cannot require a trial judge to direct a verdict simply on defendant's assertion that he had an unusual meaning of the question in mind when he responded. It should not be forgotten that Chapin's major interest, in testifying before the grand jury, was to keep himself from being accused of possible violations relating to campaign literature.

 Chapin's final point with respect to Count III is that his lack of recollection was not sufficiently proven. Of course, in the absence of a statement by the defendant, the falsity of an "I don't recall" answer must be proven by circumstantial evidence. This does not mean that proof is impossible. As another court has stated, "The jury must infer the state of a man's mind from the things he says and does. Such an inference may come from proof of the objective falsity itself, from proof of a motive to lie, and from other facts tending to show that the defendant really knew the things he claimed not to know" or recall. United States v. Sweig, 441 F.2d 114, 117 (2d Cir.), cert. denied, 403 U.S. 932, 91 S.Ct. 2256, 29 L.Ed.2d 711 (1971); see American Communications Ass'n v. Douds, 339 U.S. 382, 411, 70 S.Ct. 674, 94 L.Ed. 925 (1950); Gebhard v. United States, supra, 422 F.2d at 287–88. Here, once the jury rejected Chapin's version of the question, the evidence showed a large number of instructions about Senator Muskie over a six-month period, including the only two substantive written instructions Chapin had given Segretti. In addition, Chapin's obvious desire before the grand jury and the court to put himself as far as possible from the specifics of Segretti's campaign provided sufficient evidence of his motive to conveniently omit recollection of any specific instructions. There was, in short, enough evidence to allow the jury to determine whether Chapin had in fact forgotten the instructions he gave, and the jury verdict on Count III must therefore also be affirmed.

## III.

 Relying on the principle that relevant evidence may be excluded if it is likely to have an unduly prejudicial effect on a jury, appellant contends that the admission of the Jackson-Humphrey "sex" release and the Chisholm release was error in that the items could so prejudice the jury that Chapin would be convicted for hiring the man who put out the statements rather than for lying to the grand jury. We agree, of course, with the basic principle, as we have reiterated several times recently, see United States v. Cockerham, 155 U.S.App.D.C. 97, 476 F.2d 542, 545 (1973); United States v. Marcey, 142 U.S.App.D.C. 253, 440 F.2d 281, 284 (1971), but we do not think it an abuse of the trial judge's discretion to admit the material here.

The items involved were relevant mainly to the portion of Count I on which Chapin was acquitted. That dealt with the following exchange:

Q. Did you ever discuss in any way with Mr. Segretti the distribution of any campaign literature or statements of any kind?

A. No.

The defense on this part of the count, unlike that on the second part, was that there had never been any such discussion, not that the word "distribution" was limited to street-corner efforts by Segretti. (Tr. 698). The only three items about which Segretti was able to testify that there had been any specific discussion were the busing poster, the Jackson-Humphrey "sex" letter and the Chisholm release. (Tr. 288, 307, 326–27). These documents were clearly relevant to prove that, if there had been such discussion as Segretti contended, Chapin would, because of the nature of the items, have remembered and therefore would have *knowingly* answered the question falsely. Because of the limited number of items about which Segretti was able to give specific testimony, there was very restricted opportunity for proving through documents that the denial was knowingly false.

The prejudicial impact of the documents comes, of course, from their vile and spectacular nature, coupled with the fact that the Chisholm release was directed against the only black or female candidate in the race. Particularly since no one contended that Chapin had written the pieces or had any knowledge of them before they were distributed, he says that the prejudice outweighed the relevance.

The trial judge was cognizant of the problem and carefully balanced the factors. On the voir dire, he checked on this matter, covering both the purely offensive and the racial aspects of the material, asking whether any jurors would allow the items to interfere with their objectivity. Two jurors responded, both were privately questioned, and both were excused. That some jurors were able to admit openly the possibility that they could not be objective lends credence to the implication that the others, by their silence, truly believed that they would not be influenced. *Cf.* United States v. Liddy, 166 U.S.App.D.C. 95, 509 F.2d 428, 437 (1974). Then the judge held off ruling on the admissibility of the documents until he saw how they fit into the Government's case. When these items were admitted (after further careful reflection by the court), the judge gave the jury a cautionary instruction, reminding them of the voir dire and stating "I simply want to remind you that the issue is . . . whether or not the statements of Mr. Chapin are true or false as set out in the indictment, and there is no question of whether you agree or disagree or approve or disapprove of the contents of this kind of material." (Tr. 329). The caution was also repeated, though in less pointed terms, during the charge to the jury.

The material was far less inflammatory than evidence we have sustained against similar charges in the recent past. In *Cockerham*, for instance, descriptions of the sexual molestation and murder of a seven-year old girl were held admissible even though the defendant admitted the acts and relied solely on the insanity defense. 476 F.2d at 545. In *Marcey*, where the defendant was charged with killing his wife and similarly did not deny the act, we approved the admission of pictures of the wife after a beating by defendant, some six months prior to the crime. 240 F.2d at 284. The one case in this circuit to which defendant cites us in which we overturned a conviction because overly prejudicial evidence had been admitted involved evidence of a possible murder by a defendant charged with failure to register as a foreign agent. Frank v. United States, 104 U.S.App.D.C. 384, 262 F.2d 695 (1958). The court there found "the probative value of the evidence about the [murder] too slight and its prejudicial tendency too great to justify its introduction." *Ibid.* at 697. Here, given the need for proof of the "discuss" part of the first count, the trial court's careful weighing of the evidentiary and prejudicial values of the items, the voir dire on this subject, the cautionary instructions, and the jury's decision to acquit defendant on the charge to which the items were most relevant, we are of the opinion that the trial judge did not abuse his discretion in allowing the material into evidence.

## IV.

Chapin's final argument is that, because of the nature of the case and prejudicial pre-trial publicity, he could not get a fair trial in the District of Columbia, where the crime was committed, and his motion for a change of venue should have been granted. The standard for granting a request for a venue change is laid out in Rule 21(a), F.R.Crim.P.: "that there exists in the district where the prosecution is pending so great a prejudice against the defendant that he cannot obtain a fair and impartial trial . . . ." However, as the court stated in Jones v. Gasch, 131 U.S.App.D.C. 254, 404 F.2d 1231 (1967), cert. denied, 390 U.S. 1029, 88 S.Ct. 1414, 20 L.Ed.2d 286 (1968), " 'The ultimate question' on such a motion 'is whether it is possible to select a fair and impartial

jury, and the proper occasion for such a determination is upon the *voir dire* examination.'" 404 F.2d at 1238.[7] We emphasize that, except for the disallowance of two questions (discussed *infra*), Chapin does not challenge either the actual voir dire or the manner in which it was carried out, which was in accordance with the procedures approved in United States v. Bryant, 153 U.S.App.D.C. 72, 471 F.2d 1040 (1972), cert. denied, 409 U.S. 1112, 93 S.Ct. 923, 34 L.Ed.2d 693 (1973). In addition, Chapin never requested that the court consider the lesser remedy of granting a continuance to allow publicity to die down, and it does seem that appellant's trial, coming after the hearings before the Senate Select Committee (the Ervin Committee) had concluded and before those by the House Judiciary Committee had begun, "was at a less unpropitious time than any that has succeeded it, or [was] likely to follow." United States v. Dennis, 183 F.2d 201, 226 (2d Cir. 1950), aff'd, 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137 (1951).

 There are two distinct branches to Chapin's venue argument. The first is that because of his connection with the Nixon administration and his participation in a "dirty tricks" campaign aimed at Democratic candidates and with racial overtones, a truly fair and impartial jury could not have been drawn from the District's heavily black, and overwhelmingly Democratic, population. In support of his contention, appellant offered an affidavit from Dr. Elvin Mackey, Jr., Director of Minority Group Program Development of the American Psychiatric Association. Dr. Mackey stated that, because the heavily-black District had been denied home rule and because of the Nixon administration's policy of "benign neglect," prospective black jurors would have a "normal human reaction" of hostility toward the Nixon administration and those associated with it—coupled with a tendency to suppress such feelings when asked about them. In rebuttal, the Government's examination of Dr. Mackey showed that he had not lived in the District from 1962 to 1972, that he had not conducted any empirical studies about the attitudes of District residents as to which he had testified, nor had he consulted the studies of others, and that he had never attended a voir dire and was somewhat confused about the whole procedure.

The American Bar Association Standards on Fair Trial and Free Press state that proof of prejudice sufficient to require a change of venue may be made by "qualified public opinion surveys . . . as well as other materials having probative value." ABA Standards, Fair Trial and Free Press § 3.2(b) (1968). There may be situations in which, apart from any prejudicial publicity, prejudice against a defendant is so great and so obvious that, even with the opportunity for a probing voir dire (as was the case

---

7. In *Jones*, we discussed some of the reasons why a judge may properly defer ruling on a motion for change of venue until after voir dire:

> "It is then, and more usually only then, that a fully adequate appraisal of the claim can be made, and it is then that it may be found that, despite earlier prognostications, removal of the trial is unnecessary. Jurors manifesting bias may be challenged for cause; peremptory challenges may suffice to eliminate those whose state of mind is suspect. Frequently the problem anticipated works itself out as responses by prospective jurors evaporate prior apprehensions." 404 F.2d at 1238–39 (footnotes omitted).

Since that opinion was written, the ABA Standards on Fair Trial and Free Press, requiring that motions for venue changes be disposed of before voir dire, have been approved. ABA Standards, Fair Trial and Free Press § 3.2(d) (1968). We are not ready to find that the logic of the *Jones* case should be put aside, as a routine matter, to conform to the ABA standards. Where community passions are high or publicity both localized and virulent, it might well be that a court would carefully consider whether the defendant should even be required to prepare for a trial before a predictably hostile jury, and not automatically hold off ruling on the motion until voir dire. However, we are also of the opinion that in this case, which does not present such a situation, the logic of *Jones* still holds. We note that no circuit has as yet adopted this part of the ABA Standards as routine.

here on feelings toward the Nixon administration and those connected with it), academic sociological statements will be sufficient, in the absence of affidavits by members of the community or public opinion surveys, to convince a court that a fair trial is impossible in the District of Columbia. However, along with the trial court, we cannot say that this is such a case. Chapin's role in both the administration and the wrongdoings in which it was engaged was small; testimony on his behalf at trial emphasized that his job was almost entirely administrative with no policy responsibilities. The crime with which he was charged was not, unlike that to which Segretti pled guilty, directly related to anti-Democratic activities. Dr. Mackey's testimony in no way recognized that there might be a distinction between a potential juror's feelings as to Richard Nixon himself and one of his minor functionaries. Neither Dr. Mackey nor appellant seem to have taken cognizance of the fact that, while there may be more blacks on District of Columbia juries than on juries in other federal district courts, juries in this city are not all black, and the jury in this case was in fact split almost evenly along racial lines. Finally, the jury did acquit on substantial parts of the indictment. On this first branch of Chapin's venue argument, then, the proof presented was not nearly sufficient for us to overturn a decision within "the sound discretion of the trial court." Estes v. United States, 335 F.2d 609, 614 (5th Cir. 1964), cert. denied, 379 U.S. 964, 85 S.Ct. 656, 13 L.Ed.2d 559 (1965).[8]

The second branch of Chapin's venue argument revolves around pre-trial publicity. Citing the Rideau,[9] Marshall,[10] and Sheppard[11] cases, appellant asks us to find that publicity about him and his activities was so great that it was unlikely that a jury able to put aside prejudices and decide the case on the basis of the evidence before it could be empaneled.[12] While the argument is that no voir dire would have been effective in rooting out the prejudices of which Chapin complains, a brief description of the actual questioning will put the claim in perspective. The judge initially made it clear to the jurors that Chapin was not charged with participating in either the Watergate break-in or the cover-up, and stated that he had not been involved in such activities. Even so, he asked several questions of the panel about their knowledge of the entire Watergate affair. Jurors who had simply heard of the matter were not further questioned but the several who indicated that they had definite feelings about those "caught up" in Watergate were individually questioned and those who said they had a definite opinion about the defendant or those he worked with were excused. The judge then inquired which jurors had ever heard of Chapin or the present case. All talesmen who responded affirmatively were individually questioned as to exactly what they had heard, whether they had formed any opinion about the defendant's guilt or innocence and whether they could serve fairly. (Compare the procedure we recently approved in United States v. Liddy, supra.)

8. Since appellant's trial, two District of Columbia trials of persons associated with the Nixon administration have resulted in acquittals. United States v. Mitchell et al., Cr. No. 74–110 (D.D.C.) (acquittal of Kenneth W. Parkinson, attorney for the Committee to Reelect the President, on charges of obstruction of justice); United States v. Connally, Cr. No. 74–440 (D.D.C.) (acquittal of John Connally, former Secretary of the Treasury, on charges of accepting a bribe).

9. Rideau v. Louisiana, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963).

10. Marshall v. United States, 360 U.S. 310, 79 S.Ct. 1171, 3 L.Ed.2d 1250 (1959).

11. Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966).

12. The jury here was sequestered, and there was no indication that any during-trial publicity reached them. This distinguishes the case from Sheppard and Marshall where prejudicial information reached the jurors during trial. The harmful effect of indiscriminate publicity on a jury already empaneled and hearing the case under the rules of evidence, is inherently different in kind and degree from the pre-trial publicity in this case.

While it is difficult to get exact numbers from the record, it appears that of the 120 prospective jurors on the two panels, at the most 22 veniremen had heard of either Chapin or the case. In just about every instance, on further questioning the knowledge of the jurors turned out to be simply that the trial was about to take place. Most did not know what appellant was charged with, and no one appears to have formed a definite opinion of his guilt or innocence (although several jurors voiced strong opinions about others, such as Messrs. Haldeman, Erlichman, Dean and Hunt). These results on voir dire were a far cry from those in any of the cases cited by appellant. *Compare* Rideau v. Louisiana, *supra*, 373 U.S. at 725, 83 S.Ct. 1417 (3 members of petit jury had seen defendant's televised confession); Marshall v. United States, *supra*, 360 U.S. at 312, 79 S.Ct. 1171 (seven members of jury read, during trial, newspaper accounts of items court had ruled too prejudicial for admission as evidence); Sheppard v. Maxwell, *supra*, 384 U.S. at 354 n. 9, 86 S.Ct. 1507 (all but one juror had read something about case; publicity extensive and virulent both pretrial and during trial before unsequestered jury). *See also* Irvin v. Dowd, 366 U.S. 717, 727–28, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961) (90% of veniremen, and 8 jurors had opinion of defendant's guilt); Silverthorne v. United States, 400 F.2d 627, 635–40, 644 (9th Cir. 1968) (all veniremen had heard of case, 9 had definite opinions as to guilt of defendant; court did not voir dire jurors as to what they had heard of case; case remanded to same district for retrial).

As the ABA standards note, a decision whether to grant a change of venue can be based "on the court's own evaluation of the nature, frequency, and timing of the material involved." ABA Standards, Fair Trial and Free Press § 3.2(c) (1968). In addition, firm precedent demands that the court take into account whether the publicity is sufficiently localized that potential jurors in another area would be free of any taint from exposure to the press, enabling the change to serve its purpose. *See* United States v. Dennis, *supra*, 183 F.2d at 226; Application of Cohn, 332 F.2d 976, 977 (2d Cir. 1964); United States v. Bando, 244 F.2d 833, 838 (2d Cir.), cert. denied, 355 U.S. 844, 78 S.Ct. 67, 2 L.Ed.2d 53 (1957); United States v. Mitchell, 372 F.Supp. 1239, 1261–62 (S.D.N.Y.1973). In considering this aspect of the motion, several courts have suggested that a venue change is usually more effective if it is to a more, rather than less, metropolitan community because a big case in a small town quickly becomes a *cause celebre* and the focus for substantially more publicity than existed at the time the decision to transfer was made. United States v. Dioguardi, 428 F.2d 1033, 1039 (2d Cir.), cert. denied, 400 U.S. 825, 91 S.Ct. 50, 27 L.Ed.2d 54 (1970); Application of Cohn, *supra*; United States v. Mitchell, *supra*, 372 F.Supp. at 1261; *cf.* Northern California Pharmaceutical Ass'n v. United States, 306 F.2d 379, 383 (9th Cir.), cert. denied, 371 U.S. 862, 83 S.Ct. 119, 9 L.Ed.2d 99) (1962) ("size and general news inundation" of community supports denial of change of venue). *See also* ABA Standards, Fair Trial and Free Press at 121 n. 95 (1968). Appellant here desired a transfer of the case to a more rural community, suggesting the Southern District of Iowa as appropriate.

Our own scrutiny of the publicity in the community about appellant prior to the trial, *see* Sheppard v. Maxwell, *supra*, 384 U.S. at 362, 86 S.Ct. 1507, convinces us that the trial judge was correct in refusing to allow the transfer. While appellant's upcoming trial attracted some newspaper attention, the articles were not front-page stories, frequently mentioned the trial only in passing, and a large number concentrated on John Dean's role as a witness rather than Chapin's role as defendant. Those stories which were exclusively about the trial were factual accounts of motions filed by the defendant and proceedings in open court. Editorial comment, to the extent there was any, was essentially

sympathetic, deploring the possibility that of all the White House staff members, only Chapin, and not those more responsible for Watergate and the cover-up, was likely to be brought to trial and convicted. In addition, the publicity was at its height during January and February, 1974, and had decreased substantially by the time of trial in April. The Washington Post appears from the record to have carried no story about the trial the day it started.

 Rather than the cases cited by appellant, we think the situation here more resembles that in some less celebrated cases, such as the larceny trial of Teamsters president Dave Beck. Reviewing the publicity there, the Supreme Court found: "The news value of the original 'disclosures' was diminished, and the items were often relegated to the inner pages. Even the occasional front-page items were straight news stories rather than invidious articles which would tend to arouse ill will and vindictiveness. If there was a campaign against him as petitioner infers, it was sidetracked by the appearance of other 'labor bosses' on the scene who shared the spotlight." Beck v. Washington, 369 U.S. 541, 556, 82 S.Ct. 955, 963, 8 L.Ed.2d 98 (1962). *See also* Northern California Pharmaceutical Ass'n v. United States, *supra*; United States v. Medlin, 353 F.2d 789, 792 (6th Cir. 1965), cert. denied, 384 U.S. 973, 86 S.Ct. 1860, 16 L.Ed.2d 683 (1966). The *Beck* case was reviewed under a standard which required a showing of prejudice to overturn the denial of a change in venue. 369 U.S. at *ibid.*, 82 S.Ct. 955. In the later, more sensational *Sheppard, Rideau,* and *Estes* [13] cases, the Court did not require such a showing. We are of the opinion, however, that where publicity has not been virulent and sensational, where the community in which the trial is scheduled is large and inundated with other news, where the publicity is nationwide rather than local (appellant uncovered a substantial amount of publicity about Segretti and

Chapin even in the Southern District of Iowa), where the jury is thoroughly questioned about what they have read and its effect, and where the jury is then sequestered, some showing of prejudice is required to overturn the trial court's reasoned decision. *See* Murphy v. Florida, —— U.S. ——, ——, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975); Jones v. Gasch, *supra*, 404 F.2d at 1242. Appellant has made no such showing, nor is it likely that he could in view of the jury's verdict of acquittal on a substantial portion of the charges.

██ As for the voir dire questions which the judge refused to ask, we hold that he was well within his bounds. These questions concerned the voter registration of potential jurors over the past four years. As part of the court's voir dire, jurors were asked whether they believed that their own connection or that of a close friend or relative with a political party, particularly during the 1972 Presidential campaign, would prejudice them for or against the defendant and whether anyone or members of their families had worked in the 1972 campaign for the Committee to Reelect the President. At the close of this voir dire, the court asked counsel for additional questions. Chapin's counsel replied "I can see the reason why Your Honor has not gone into political views, but, from the point of view of our position, we would stand on the questions as submitted." (Tr. 131) The judge stated that he thought he was constitutionally barred from asking the questions.

Looking at the list of questions submitted by appellant on "political alignment", we can understand the court's position. The list contains nine questions, one of which was asked by the court as part of its own voir dire. Six of the other questions might in fact raise First Amendment problems, in that they asked who jurors had voted for, which political parties they had contributed to, worked for, etc. *Cf.* NAACP v. Alabama, 357

---

**13.** Estes v. Texas, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965).

U.S. 449, 461–62, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958). We have been cited to one case in which this problem is discussed. In Connors v. United States, 158 U.S. 408, 15 S.Ct. 951, 39 L.Ed. 1033 (1895), involving a charge of tampering with a ballot box, the requested questions were similar to those presented here. Affirming the conviction against a charge that defendant did not have the opportunity to help select an impartial jury because of the limited voir dire, the Court stated that questions about political affiliation should be disallowed, even in a case involving politics, except where preliminary questioning, such as that conducted here, had indicated that a potential juror "might, or possibly would, be influenced in giving a verdict by his political surroundings." *Ibid.* at 415, 15 S.Ct. at 953. There were no such indications with regard to the jurors here.

It is possible that, because of changes in election laws since *Connors*, the two questions specifically pointed out by Chapin on this appeal, relating to voter registration rather than actual voting, should have been asked. In the District of Columbia, voter registration lists by party are now compiled and are public. It would even have been possible for Chapin's attorneys, armed with the list of names and addresses of veniremen, to get part of the information directly from the Board of Elections. In these circumstances, the constitutional basis for denial of these particular questions is not as clear as for the others. As noted above, however, these two "registration" questions were buried in a list of much more questionable ones, and counsel at the trial did not, when faced with the judge's reasons for denying all the questions, single out these inquiries as permissible. In this situation, and especially since there was a substantial voir dire on political bias and prejudice, we cannot say that the trial judge abused his discretion in denying the list of political questions, including those only now highlighted, as a whole. *Compare* Ham v. South Carolina, 409 U.S. 524, 93 S.Ct. 848, 35 L.Ed.2d 46 (1973) (no questions asked about racial prejudice despite clear defense request).

Affirmed.