UNITED STATES of America,
Plaintiff-Appellee,

v.

Angelo MARTELLANO,
Defendant-Appellant.

No. 81–1193.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 25, 1981.
Decided April 20, 1982.

Robert E. Sutton, Milwaukee, Wis., for defendant-appellant.

Judith F. Dobkin, Chicago Strike Force, Chicago, Ill., for plaintiff-appellee.

Before WOOD and CUDAHY, Circuit Judges, and DUMBAULD, Senior District Judge.*

HARLINGTON WOOD, Jr., Circuit Judge.

■ Defendant Angelo Martellano was convicted in a 1980 jury trial of a single violation of 18 U.S.C. § 1623(a)[1] for an alleged false declaration before a special grand jury investigating possible violations of federal gambling, extortion, and racketeering laws. On appeal he raises various issues, but we need consider only the possible ambiguity of the question alleged to have been falsely answered together with the sufficiency of the evidence.

The core of the one-count indictment is concise:

4. At the time and place alleged in paragraph one (1), Angelo Martellano appeared as a witness before the Grand Jury, and after having been sworn, and then being under oath, testified falsely before the Grand Jury as follows:

Q. Have you at any time—first of all, during the period you were employed at Snug's, did you ever have occasion to accept wagers on sporting events?

A. No.

5. These declarations by the defendant were false and known by him to be false when made, because on or about January 8, 1980, he accepted a wager in the amount of fifty dollars on a professional football game.

\* \* \* \* \* \*

## I.

The basic facts are not disputed as it was stipulated that the question was asked and answered as alleged. The defendant was the maitre d' during a period in late 1979 and early 1980 at Snug's, a restaurant in Milwaukee, Wisconsin, the scene of an undercover investigation by the Organized Crime Strike Force and the FBI. Special Agent Dale E. Farmer of the FBI, using the name Donald Franks and posing as a patron, frequented Snug's during that period. He became acquainted with the defendant, and that relationship culminated in a bet of $50 between them on the outcome of the 1980 Super Bowl football game. The defendant won the bet and the agent paid off.

## II.

The essence of the defendant's defense is, first, that the question on its face is ambiguous as it inquires about "wagers" on "sporting events" in the plural. Since the evidence showed only one bet, he therefore claims to have answered honestly.

But beyond semantics the defendant claims to have misunderstood the thrust of the question, and so explained in his testimony. Facing a federal grand jury probing racketeering and organized crime, as he says he was informed before the grand jury, he did not conceive that the question

---

\* Honorable Edward Dumbauld, Senior District Judge of the Western District of Pennsylvania, is sitting by designation.

1. 18 U.S.C. § 1623(a) provides in pertinent part:

Whoever under oath ... in any proceeding before ... any ... grand jury of the United States knowingly makes any false material declaration ... shall be fined not more than $10,000 or imprisoned not more than five years, or both.

could be directed at his one "personal" Super Bowl $50 bet. Preceding that question, he testified he was questioned about the use of the telephone in Snug's, the principal office equipment of a bookie. Along with the plural aspects of the question, he was misled, he says.

The government dismisses all of that as "lexicological gymnastics," since the question was clear and unambiguous. There was interest, the government explains, in even a single bet as was apparent from the use in the question of the phrase, "did you ever have occasion."

The government's evidence was brief, consisting of the testimony of Agent Farmer, an FBI female employee who accompanied Agent Farmer as part of his cover, and another Snug employee, James Moos. Moos, after immunization, testified that after the agent lost the bet, Moos was given the money by the agent to give to the defendant, which he did. Although there was some suggestion of other possible gambling activities at Snug's, no effort was made to prove that the defendant while at Snug's accepted other than the one wager on a sporting event. The government offered no evidence about what had occurred before the grand jury, except what was revealed at trial from an inconclusive cross-examination of the defendant.

## III.

■ There is no crime of false swearing before a grand jury unless the defendant's answer about a material fact was knowingly false. *United States v. Crippen*, 570 F.2d 535, 537 (5th Cir. 1978), *cert. denied*, 439 U.S. 1069, 99 S.Ct. 837, 59 L.Ed.2d 34 (1979). A false answer given because of inadvertence, honest mistake, carelessness, neglect, or misunderstanding does not constitute the crime. *United States v. Kehoe*, 562 F.2d 65, 69 (1st Cir. 1977). Materiality is a matter of law for the court, *United States v. Watson*, 623 F.2d 1198, 1201–02

(7th Cir. 1980), and was accordingly determined by the trial judge. Except for that one issue of law, the burden, as it does in all criminal cases, rests upon the government to prove the alleged false statement beyond a reasonable doubt. *Kehoe*, 562 F.2d at 69. In our review of the case "[t]he verdict of the jury must be sustained if there is substantial evidence, taking the view most favorable to the Government, to support it." *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942).

That the defendant testified he misunderstood the question does not end the matter. *United States v. Chapin*, 515 F.2d 1274, 1283 (D.C.Cir.), *cert. denied*, 423 U.S. 1015, 96 S.Ct. 449, 46 L.Ed.2d 387 (1975). It may remain an issue for a properly instructed jury, and the jury was properly instructed in this case. "When the question and answer may have more than one meaning standing alone, their intended meaning is ordinarily an issue for the jury to determine from their context and other indicia of the witness' intent in giving the answer." [2] *United States v. Williams*, 536 F.2d 1202, 1205 (7th Cir. 1976).

■ We see no "fundamental ambiguity" in the question dictating that the issue be taken from the jury. *United States v. Bonacorsa*, 528 F.2d 1218, 1221 (2d Cir.), *cert. denied*, 426 U.S. 935, 96 S.Ct. 2647, 49 L.Ed.2d 386 (1976). It is understood that many questions may lend themselves to various interpretations "when subjected to ingenious scrutiny after the fact," *United States v. Ceccerelli*, 350 F.Supp. 475, 478 (W.D.Pa.1972), but the words used are "to be understood in their common sense, not as they might be warped by sophistry or twisted in pilpul." *Crippen*, 570 F.2d at 537. Imaginative hindsight will not save a defendant who has testified falsely. The jury, however, must have some evidentiary help from the government to protect the important grand jury process from being thwarted by prevaricators.

---

2. In this case we are not concerned with any intent distinction although a conviction for perjury under 18 U.S.C. § 1621 requires a showing of wilfulness, while a conviction under 18

U.S.C. § 1623 requires only that the false statement be "knowingly" made. *United States v. Watson*, 623 F.2d 1198, 1207 (7th Cir. 1980).

The ideal is for the use of precise questions as a predicate for perjury, *United States v. Laiken*, 583 F.2d 968, 971 (7th Cir. 1978), but reliance on other evidence may suffice. The particular question at issue was not precise. The phrase relied on by the government, "did you ever have occasion" wars with the plural "wagers" and "sporting events" and does not transform plural to singular. The question was posed orally by an experienced government prosecutor. It was not submitted in writing for the lay witness defendant to analyze before he answered it. There is the possibility that a witness may give a true answer under a reasonable interpretation of the question, but that answer could actually be a false answer as the witness himself interpreted the question, *Chapin*, 515 F.2d at 1280, but that has not been shown.

The plural aspects of the question standing alone might have been easily cleared up, *United States v. Rosen*, 353 F.2d 523, 534 (2d Cir. 1965), *cert. denied*, 383 U.S. 908, 86 S.Ct. 889, 15 L.Ed.2d 663 (1966), but the issue is complicated by the defendant's not unreasonable explanation. Even a local grand jury might not be expected to have much interest in a modest bet between acquaintances on a Super Bowl game. Were it otherwise the grand jury net might ensnare some more interesting specimens than a maitre d'. Added to this general perception is the defendant's testimony that he was informed by the grand jury that its purpose was to investigate organized crime. The cross-examination challenged the defendant's choice of words, but failed to put the issue to rest. Defendant claims he was also misled by questions concerning his use of the telephone at Snug's which preceded the critical question. To him, as it might to others, it suggested interest in a bookie professional gambling operation. The defendant denied at trial any involvement of that type and the government established none.[3]

Instead of taking the defendant's defense seriously the government tried to talk it away without evidence. It is not unusual to have the indictment itself set forth the context in which the question and allegedly false answer arose, but we have only the one questionable question and answer, no more. *United States v. Albert*, 568 F.2d 617, 623 n.3 (9th Cir. 1977); *Bonacorsa*, 528 F.2d at 1220 n.5. The context of the question and answer is often of critical importance if it is claimed the question was ambiguous or was misunderstood as it is in this case. The government's evidence does not show what, if anything, the defendant was informed by the grand jury about the subject of the investigation. It is common grand jury practice to preliminarily identify for the witness, at least to a limited extent, the subject matter of the inquiry. *Kehoe*, 562 F.2d at 67–68. When questions are considered in context with the purpose of the investigation known to the witness and in context with any series of questions asked, then the jury may have some foundation for a reasonable and definite determination about the meaning of the question. *Chapin*, 515 F.2d at 1280. A question and answer cannot be lifted out of context as there is the risk of giving them a wholly different meaning. *United States v. Paolicelli*, 505 F.2d 971, 973 (4th Cir. 1974). It may not be necessary for the government to introduce the defendant's entire grand jury testimony, but it must be sufficient to put the question and answer in context so as to shed light on the meaning of the question and response. *United States v. Mulligan*, 573 F.2d 775, 778 (2d Cir.), *cert. denied*, 439 U.S. 827, 99 S.Ct. 99, 58 L.Ed.2d 120 (1978). Not only the preliminary questions may be important to the context, but there may be a qualifying colloquy which followed the question and answer in issue. *United States v. Tonelli*, 577 F.2d 194, 197 (3rd Cir. 1978). Considered in the context of the examination of the witness, an ambiguous question may be rendered clear and unambiguous. *Crippen*, 570 F.2d at 537. This common sense context rule works both ways. The defendant may not establish his

---

**3.** One of the other issues raised by defendant was the exclusion of "expert testimony" of a local police officer familiar with gambling operations. The offer of proof showed the officer would have interpreted the question as did the defendant. We need not reach that issue.

defense by isolating a statement from its context in order to try to give it "a meaning entirely different from that which it has when the testimony is considered as a whole." *Bonacorsa,* 528 F.2d at 1221. In view of the question itself and the reasonable explanation of the defendant, context in this case was vital.

So far as we know there was only the one general question about the defendant accepting wagers on sporting events. It is common practice to go from the general to the specific question to form the predicate. *Paolicelli,* 505 F.2d at 973. That appears not to have been done here. A natural and fair follow up question would have been, "You mean you have never even accepted a bet on the Super Bowl?" A "yes" to that question would have given the government a solid foundation for its case, but a "no"

would have destroyed it. So far as we are aware no other charges against the defendant emanated from the grand jury investigation. It thus appears that the government had no other way to proceed against this defendant other than to try to snag him on the one, ambiguous question.

The experienced government attorney who conducted the grand jury inquiry testified at a hearing on materiality outside the presence of the jury. On cross-examination an effort was made to find out what the government attorney meant by the particular question and the extent of his knowledge about the one Super Bowl bet at the time he examined the defendant. The responses of the attorney are less than enlightening.[4]

It is difficult to ascertain from the materiality testimony exactly what the govern-

---

4. These samples of that testimony are not in full context, but the context is sufficient to fairly illustrate some of the background difficulties about the questioning which were unknown to the jury.

\*    \*    \*    \*    \*    \*

Q And it's a fact, is it not, that you knew by virtue of a report filed by Special Agent Farmer on January 23, 1980, that Special Agent Farmer had made a bet with Mr. Martellano for $50 on the Super Bowl?
A I don't believe that I had seen that report at the time Mr. Martellano testified. I was aware of wagers or of a wager or wagers having been made with Mr. Martellano prior to his testimony before the Grand Jury. I don't believe the details of that were known to me.

\*    \*    \*    \*    \*    \*

Q Did you or did you not know that Agent Farmer had made a bet with Angelo Martellano as of January 23, 1980, not whether you believe you knew or not, did you know, or didn't you?
A I knew that a wager had been placed with Mr. Martellano, at least one wager.
Q By Farmer?
A By an undercover agent. I believe the only one at that time was Farmer, Yes.
Q Did you know it was for $50?
A I believe that I did not.
Q Did you know it was on the Super Bowl?
A No, I did not.
Q Did you know that Agent Farmer had lost the bet?
A Not at the time Mr. Martellano testified.

\*    \*    \*    \*    \*    \*

Q You asked that question because of information that had been furnished you, is that correct?
A That's correct.
Q You knew at that time that an undercover agent had placed a bet with Mr. Martellano?
A Correct.
Q Did you know the date the bet had been placed?
A I don't believe so.
Q Well, again Mr. Roller,—
A To the best of my recollection sir, no, I do not.
Q Did you know that it had been one bet and only one bet?
A No, I did not.
Q What information did you have that there was more than one bet that had been placed by an undercover agent with Mr. Martellano?
A Both the fact that a bet had been placed and the fact that there was information perhaps from the same undercover agent or perhaps from some other source that Mr. Martellano had accepted more than just the wager from the undercover agent.
Q So, it is a correct statement, is it not, that your question when it is phrased in the plural, that is to accept wagers, was intended to be in the plural?
A No, I asked if he had ever had,—
Q Mr. Roller, you are a lawyer, you know that the rest is not responsive to my question.

\*    \*    \*    \*    \*    \*

Q In other words, then it is correct that you misspoke, you intended to ask in the singular?

ment attorney knew about the Super Bowl bet at the time the general question was propounded to the defendant. Government counsel volunteered to the trial court that if he had known more about the bet, he would have followed up with a specific question about that bet. Why he knew there had been a wager but none of the details of that simple incident before examining the witness is not explained. Even assuming that for some reason he was not fully informed about that one bet, he knew enough to have followed up with a more specific question. Had government counsel made use of the information which as far as we can tell he should have known in order to form a specific question, it could have easily been done. "Since the prosecutor chose to leave the record in an equivocal condition, it cannot be the basis of a false swearing conviction." *Tonelli*, 577 F.2d at 200.

That same materiality testimony casts further doubt on what was intended by the plural aspects of the question. The government argues here that the question was directed at the single Super Bowl bet. The attorney who put the question suggests he might have had knowledge of other bets, and when asked if he had misspoken and intended to ask in the singular, his response was "no." The attempt by the trial judge to inquire brought a response which only

clouded the issue further. We do not intend by this examination of that testimony to reflect adversely on a busy government attorney who at the time of the grand jury inquiry may not have considered the one question to be of special importance. Later, however, when that lone question was seized upon as a basis to indict the defendant, it took on considerable significance. Against that background, it is difficult to justify labeling the defendant's defense as merely "lexicological gymnastics." If that characterization applies to anything, it may be to the government's case.

The one lone question for which the defendant stands guilty of answering falsely had some of the elements of a trap unless the witness was sophisticated enough to do a better job answering the question than the government counsel did in asking it. To be safe the defendant would have had to recognize the various interpretations and give two answers to the one ambiguous question. The witness faced the grand jury alone without counsel being with him. A witness is not presently entitled to have counsel present in the grand jury room, although he may ask for a recess to consult counsel outside the grand jury room. Some are urging, however, that the grand jury process needs reforming to, among other things, permit the witness to have counsel present in the grand jury room. If the

A No.

\* \* \* \* \* \*

Q Mr. Martellano did not invoke the Fifth Amendment at any time during his testimony, did he?

A No, he did not.

Q And after he had answered no to your question, you did not direct to him any specific question about betting on the Super Bowl in 1980, a $50 bet with Agent Farmer, did you?

A No, I did not.

\* \* \* \* \* \*

Later in the cross-examination it developed that government counsel did know the full details of the one Super Bowl bet before examining the subsequent grand jury witness, James Moos, another employee at Snug's. The cross-examination continued.

\* \* \* \* \* \*

Q And between the time that Mr. Martellano left and you called Mr. Moos as a witness, you did become aware of the specific

nature of one bet between Undercover Agent Dale Farmer and Mr. Martellano for $50 on the Super Bowl of 1980, didn't you?

A Yes, I became familiar with that specific transaction.

Then the court made an effort to clear up the issue.

The Court: When you answered Counsel's question as to the specifics of the wager by Martellano, by that, what did you mean, the amount, the date and the event?

A Basically, yes, Your Honor. I was aware as a result of some conversations with agents, perhaps even Farmer, but certain agents, Demarco, about a wager being placed. I am not quite confident I did not know the amount, I did not know the event and I am not even sure if I knew the frequency. Quite frankly, Your Honor, if I had, I would have followed up questions of Mr. Martellano on the $50 wager.

\* \* \* \* \* \*

government demonstrates that it is unable or unwilling to fairly frame grand jury questions calling for clear cut and responsive answers without unfair risk to a witness, particularly where a question is to be the foundation for a false statement indictment, then the government may only be extending an invitation to defense counsel to join them before the grand jury.

### IV.

The jury had less information about this case than we do upon which to reach a verdict. Although ambiguity may ordinarily be for the jury to resolve, the jury must have substantial evidence upon which to base a verdict of guilty beyond a reasonable doubt or otherwise the case must be reversed for insufficiency of the evidence the same as in other criminal cases. The jury may have guessed correctly, but it is not entitled to guess at all. A defendant "may not be assumed into the penitentiary." *United States v. Brumley*, 560 F.2d 1268, 1277 (5th Cir. 1977).

Reversed.[5]

5. *See Burks v. United States*, 437 U.S. 1, 98    S.Ct. 2141, 57 L.Ed.2d 1 (1978).