**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Anita ABRAMS, Defendant-Appellant.**

**No. 77–5107.**

United States Court of Appeals, Fifth Circuit.

Feb. 24, 1978.

Joel Hirschhorn, Miami, Fla., for defendant-appellant.

Jack V. Eskenazi, U. S. Atty., Marsha L. Lyons, Asst. U. S. Atty., Miami, Fla., for plaintiff-appellee.

Before BROWN, Chief Judge, RONEY and FAY, Circuit Judges.

BROWN, Chief Judge:

A jury returned a verdict of guilty against Anita Abrams on two out of three counts of making false material statements before a federal grand jury in violation of 18 U.S.C.A. § 1623.[1] She claims on this appeal that she was denied a fair trial, first, because of the prejudicial misconduct of the Trial Judge, and second, because of his failure to grant a mistrial following an allegedly prejudicial answer by one witness. She also challenges the sufficiency of the evidence as to both counts.[2] We agree only that there is insufficient evidence to sup-

---

1. Abrams was acquitted on Count I.

2. Defense motions for judgment of acquittal and a new trial were denied.

port the verdict on Count III and reverse as to that count. Her conviction on Count II is affirmed.[3]

Because of the extremely complicated nature of this case, we will set forth the facts as they relate to each issue raised by appellant and address the sufficiency attack first.

## I. Sufficiency Of The Evidence

The United States Attorney for the Southern District of Florida had been conducting an investigation into various allegations stemming from insurance claims filed by the law offices of James A. Davis for numerous clients who had received medical treatment from Dr. M. S. Fox[4] or Westchester Hospital or both. Settlement of accident cases following negotiations with insurance companies or trial would be made by Davis' office. The insurance company would pay claims to Davis who, in turn, would disburse the proceeds to his clients, the accident victims, after deducting attorneys' fees, medical expenses, court costs, investigative fees, and other related costs.

Abrams, who worked as a secretary and bookkeeper in Davis' office, was subpoenaed by the grand jury in 1976 and was ultimately granted use immunity. She made three appearances before the grand jury; Counts II and III arose out of her July 26, 1976 appearance.[5]

## A. Count II: The Yva Henry Case

### 1. Documentary Evidence

The false statements which formed the basis of this count involved a cost breakdown which had been prepared for Yva Henry, a client of Davis. Henry had written a letter dated March 12, 1974 to Paul Gross of the Florida Bar complaining about the amount she was to receive in settlement of her claim for an accident which had occurred in April 1973.[6] Gross forwarded this complaint to Davis on March 15, 1974 and requested a written response.[7] By letter dated April 1, 1974, signed for Davis by Abrams, the latter forwarded to the Florida Bar a "closing statement" on the Henry case,[8] containing a $231.50 charge for "Costs."

On April 2, 1974, Gross called Davis' office to request a breakdown of the $231.50 in costs as shown by the following telephone message directed to "Anita:"

> Yva Henry—
> (cost 231.50 wants
> 5564 Case No.[9] breakdown?)

That same day, Abrams signed a letter to the Florida Bar on behalf of Davis, enclos-

3. Abrams received an 18-month sentence and a $1,000 fine on Count II. The sentence on Count III was suspended and she was placed on probation for three years to run consecutively with the Count II sentence.

4. Defense counsel informed the Court at oral argument that Davis and Fox were convicted on 104 counts of mail fraud.

5. The transcripts of all three appearances were admitted into evidence.

6. Gov't Ex. 3A. The Yva Henry file was seized pursuant to a search warrant.

7. Gov't Ex. 3B.

8. This closing statement (the second page of Gov't Ex. 3C) contained the following breakdown:

CASE NO. 5564

CLOSING STATEMENT
FOR
HENRY – YVA

| | | |
|---|---:|---:|
| SETTLEMENT | | $6,500.00 |
| ATTORNEY'S FEES | $2,600.00 | |
| COSTS | 231.50 | |
| DR. M. S. FOX | 475.00 | |
| DR. P. LIPPMAN | 40.00 | |
| JACKSON MEMORIAL HOSPITAL | 49.00 | |
| WESTCHESTER GENERAL HOSP. | 804.50 | |
| | $4,200.00 | $4,200.00 |
| PROCEEDS TO CLIENT | | $2,300.00 |

9. This telephone slip forms part of Gov't Ex. 7.

ing a breakdown she prepared which listed these items: [10]

CHARGE SHEET ON
YVA HENRY CASE NO. 5564

| | | |
|---|---|---|
| [1] | Conference with Dr. M. S. Fox (4/25/73) | $50.00 |
| [2] | Conference with Dr. M. S. Fox (6/1/73) | 25.00 |
| [3] | Investigation and Photography | 107.50 |
| [4] | Photographs | 35.00 |
| [5] | Accident Report | 3.00 |
| [6] | Westchester General Hosp.— Medical Records | 6.00 |
| [7] | Jackson Memorial Hospital— Medical Records | 5.00 |
| | Total | $231.50 |

Items [1]–[4] of this breakdown are the source of Abrams' present problems.

As to items [1] and [2] (the two conferences with Dr. Fox on 4/25/73 and 6/1/73), Gov't Ex. 14, which was taken from the Yva Henry file in Dr. Fox's office, is critical. That exhibit comprises undated slips of paper, one of which is a telephone call memo reading in part:

$75 JAD [11]
Bill Conference (2)
Iva Henry 50
 25

The other critical slip of paper from Fox's Henry file forming the second part of Ex. 14 reads:

Fla Bar
Assn.

Mr. Gross
 Eva Henry
Re:
 JAD
4/22/74
 to verify·
 total bill
 $400 – or $475

The bottom half of this note, beginning with "4/22/74" appears to be in a different handwriting from the top half. The third portion of Gov't Ex. 14 comprises an exact duplicate of an undated typed bill to Davis for the two office conferences in April and June 1973 which appears in the Henry file in Davis' office.[12]

Item [3] on the breakdown, relating to $107.50 for investigation and photography, was ostensibly covered by a May 17, 1973 typed invoice in duplicate on the billhead of Worldwide Detective Agency.[13] This bill charged $100 for investigative services and $7.50 for "auto."

With regard to item [4] covering $35 for photographs, the Henry file contained two critical documents: a photography shop invoice for film and a film developing envelope, *both* dated April 2, 1974, the same day on which the Florida Bar telephone inquiry and the Abrams breakdown were made.[14] The photographs of the location of the Henry accident which were placed in the Henry file could not have been taken any time before March 1974.[15]

10. The letter and enclosed breakdown comprise Gov't Ex. 3D. The items are numbered with brackets for easy reference. According to Davis, he worked up the breakdown and instructed Abrams on what was to be done. Abrams told the grand jury that she prepared the breakdown. See appendix, answer 47.

11. The obvious reference here is to James A. Davis.

12. Gov't Ex. 9. It is significant to note that these two conferences on April 25 and June 1, 1973 for $50 and $25, respectively, were not billed as the Henry case progressed as had Henry's other medical expenses. This fact is demonstrated by Gov't Ex. 4, which contains a July 27, 1973 bill from Dr. Fox for services rendered for Henry. A $200 item on that bill covers 20 office visits at $10 each. One $10

office visit was on April 25; another was on June 1. See also in this connection note 23, *infra*.

13. Both the original and duplicate were found in Davis' files and they comprise Gov't Ex. 10.

14. Gov't Ex. 11. It must be borne in mind that the Yva Henry case was closed by April 2 (she was complaining about the amount Davis was to receive from the total settlement). The point is, why was there any need for photographic work on April 2, 1974?

15. Gov't Ex. 12. At least one of the photos showed a construction site. It was stipulated at trial that a witness would testify that he did not begin construction at this site until March 1974.

The most significant document in Davis' Henry file is a slip of paper comprising part of Gov't Ex. 7.[16] The first four lines of this slip, listing the four items, are in Davis' handwriting. The addition and subtraction are in Abrams' handwriting.

| | | | |
|---|---|---|---|
| Photos | 10 @ 3.50 | 35.00 [17] | |
| A.R. [18] | | 3 | |
| W.R. [19] | | 6 | |
| J.M.H. [20] | | 5 | |
| | | 49.0 | |
| | | 75 | |
| | | 124 | |
| | | 231.50 | |
| | | 124.00 | |
| | | 107.50 | |

Another slip of paper, totally in Davis' handwriting (Gov't Ex. 8), reads:
231.50

| | | |
|---|---|---|
| Invest. | 150 | 24.90 |
| Conf. Dr. | 100 | 1 50 |
| Acc. Report | 23 | 26.40 |
| West. | 6 | 1 50 |
| J.M.H. | 5 | 27.90 |

**16.** The other part of Ex. 7 was the telephone message to "Anita." See text at note 9, *supra*.

**17.** It is interesting to note that Gov't Ex. 11, see note 14, *supra* and accompanying text, contains 11 photos, not 10. The photo envelope, Ex. 11, dated April 2, 1974, shows that 11 prints were made. Furthermore, no matter which figures on the film envelope are used— the regular price for development ($36.85) or the discount price ($28.49)—to add to the photography shop invoice for film ($1.46), the total is not $35.00.

**18.** "A.R." apparently means accident report.

**19.** Westchester report.

**20.** Jackson Memorial Hospital.

**21.** The calculation is in text following note 20. See also note 10, *supra*.

**22.** Abrams did not testify at the trial.

**23.** See appendix, answers 2, 18, 20, 36, 48, 50, 51.
Abrams' grand jury testimony and Davis' trial testimony on accounting procedures was far from clear; indeed, it can only be described as totally evasive. We have, however, gleaned from the record that at the time when Abrams

A comparison of these figures and those of Ex. 7 with the figures on the breakdown (see text following note 10, *supra*) reveals that the breakdown sent to the Florida Bar matched the figures of Ex. 7 containing Abrams' mathematical calculation.[21]

## 2. The Grand Jury Testimony

The testimony which formed Count II of the indictment fills nine legal-size pages. So that we do not further lengthen this opinion, that testimony is attached as an appendix. The questions and answers are numbered for easy reference and the statements which we believe the jury could reasonably have concluded were false are italicized.

▆▆▆ Abrams maintained throughout her grand jury testimony [22] that the $231.50 figure was based on bills actually in the file prior to the settlement of the Henry case, on the cost sheet she prepared as the Henry case progressed, or on cost cards which the accountant had.[23] Indeed, she effectively took over as Davis' bookkeeper, Davis' accountant was keeping tabs on costs disbursed in behalf of clients through the use of cost cards which he personally maintained. From these cost cards, Abrams would prepare closing statements, pay bills, etc. She ultimately instituted a system of "charge" or "cost" sheets on which she (as opposed to the accountant) would enter various costs for each client as they were incurred. According to Davis, charge sheets were kept separate from the file. The cost sheet for the Henry case was missing during the grand jury hearing and at trial and nothing in the record explains its unavailability.

The grand jury testimony given to the jury additionally disclosed one other method of keeping track of costs chargeable to clients. The accountant maintained a journal on which Davis checks made out by Abrams in payment of each client's bills for costs were entered by the accountant. The journal sheet for Yva Henry, not made an exhibit at the Abrams trial, showed $150, not $231.50, in costs. This $150 amount did not include checks issued to Dr. Fox for the two conferences as the following grand jury testimony demonstrates:

Q. When such conferences are billed to a client, would Dr. Fox be paid for such a conference?
A. Yes, he would.

denied fabricating the costs.[24] We believe that the evidence overwhelmingly supported a jury conclusion beyond a reasonable doubt that she gave false testimony.[25] Our view is that the jury could have reasonably concluded that actual events proceeded along the following lines and that Abrams must have known about and remembered those events when she testified before the grand jury: When the Florida Bar request for the $231.50 cost breakdown was made, Abrams—or someone in Davis' office with Abrams' knowledge—arranged to have the photographs taken (item [4], $35), Davis listed minor amounts to be charged for perfunctory reports made in almost every accident case (items [5]–[7], $14), and Abrams—or someone in Davis' office with Abrams' knowledge—arranged with someone in Dr. Fox's office to bill Davis for $75 of those costs (items [1] and [2]). And when Abrams totaled those costs and arrived at only $124, she subtracted the subtotal from $231.50, got $107.50, and she—or someone in Davis' office with her knowledge—fabricated an invoice on Worldwide Detective Agency billhead (item [3]) to justify the $107.50 difference. This view is based on the following.

First, it is clear from the documentary evidence that the Fox conferences were not billed in the ordinary course (see notes 12 and 23, *supra*). Second, the Fox bill is not dated as is the other Fox invoice for $475

(see notes 8 and 12, *supra*). Third, it is also clear that the Davis office requested that these conferences be billed in response to the Florida Bar inquiry. Thus, as to the Fox conferences, there was sufficient evidence for the jury to conclude beyond a reasonable doubt that Abrams violated § 1623 when she denied knowing the circumstances under which the undated Fox bill was prepared.[26]

There was also sufficient evidence to support a conclusion beyond a reasonable doubt that Abrams gave perjured testimony concerning item [3], the $107.50 invoice from Worldwide Detective Agency for investigation and photography. Weigel, owner of Worldwide, stated that a search of his records disclosed no investigation having been conducted on the Yva Henry case. Moreover, when Weigel billed clients, he never submitted the original and the copy as ostensibly was done in the Henry case.[27] Hallen, a Worldwide employee who did investigative work for Davis on Weigel's license, also found no record of investigative or photographic work done in behalf of Henry. Hallen would bill Davis by submitting to Abrams handwritten slips containing case numbers and the plaintiff's name; he never typed invoices. Abrams paid Hallen directly by check. Hallen unequivocally denied submitting the typed $107.50 invoice of Gov't Ex. 10.[28] Furthermore, sometime in 1973, Hallen, with Weigel's permission, had

---

Q. How would he be paid?
A. By check.
Q. And where would this cost be listed?
A. On the charge sheet.
Q. So if there was a conference, such as this, there should be a check to Dr. Fox; is that right?
A. There should be, yes.
Q. That's also not listed in this ledger sheet concerning Yva Henry that you looked at before, is it?
A. No.
Grand Jury Tr. at 84 (Gov't Ex. 2A).

**24.** See appendix answers 15, 33. See also answer 39.

**25.** The applicable standard of review is not whether we think the evidence sufficient but

whether a reasonable jury could so conclude beyond a reasonable doubt. *E. g., United States v. Parr*, 5 Cir., 1975, 516 F.2d 458, 464. Additionally, evidence in a criminal case must be viewed in the light most favorable to the government. *E. g., United States v. Duhon*, 5 Cir., 1978, 565 F.2d 345 (1978).

**26.** See appendix, answer 54.

**27.** See note 13, *supra* and accompanying text.

**28.** Hallen was the only investigator to whom these invoiced services could have been attributed. Weigel did not personally do any work for Davis. Hallen worked for Davis on a case-by-case basis. The other investigator used by Davis was on the attorney's regular payroll.

given blank Worldwide billheads to Joe Moore, Davis' office manager.[29]

Based on this uncontradicted testimony, the jury was justified in finding that Abrams made false statements when she named Hallen as the source of the $107.50 figure[30] and when she said that the bill was prepared by the investigator,[31] and submitted.[32] In addition, Abrams' asserted failure to remember and denial of knowledge as to what she was doing when she performed the mathematical calculation of Gov't Ex. 7[33] could reasonably have been considered perjured.[34]

Similarly, there was abundant evidence to support a beyond-a-reasonable-doubt conclusion that Abrams' testimony concerning the $35.00 for photographs was false. The invoice for film and the film envelope were both dated April 2, 1974, the same day on which the Florida Bar telephone inquiry was made when the Henry case was, for all intents and purposes, closed.[35] Hallen never performed any photographic work on the Henry case and did not submit the invoice for photography services. And at least one of the photographs in the Henry file establish that the pictures were not taken until at least eleven months after Mrs. Henry's April 1973 mishap.[36] No sensible explana-tion was forthcoming as to why photography costs need have been incurred in connection with a closed case, and the grand jury gave Abrams every opportunity to offer one.[37]

Thus, we think a jury could justifiably find that Abrams committed perjury when she (i) told the grand jury that the bills were Dave Hallen's,[38] (ii) denied knowing the circumstances under which the photographic bills were obtained,[39] and (iii) denied that the bills were obtained the day after receiving the Florida Bar letter to justify the costs.[40]

Lastly, based on all the evidence relating to the four items on the breakdown, we believe that a jury could conclude beyond a reasonable doubt that Abrams' statements that the $231.50 in costs came from cost sheets and cost cards,[41] and her denial of attempts to justify the costs[42] were false.

■ Appellant's sufficiency challenge is multi-pronged. Abrams argues first that she responded to questions by describing the office routine she normally "would" use, instead of stating what she actually "did" with respect to a particular item. We agree with this argument as to certain answers,[43] but believe it conveniently over-

**29.** Moore had previously worked for Worldwide. In fact, Hallen replaced Moore when Moore left the agency.

**30.** See appendix, answers 25 and 30. If the jury believed Hallen and Weigel, as undoubtedly was the case, the conclusion is inescapable that these answers were false because Hallen was the only investigator in a position to perform and bill these services. See note 28, *supra.*

**31.** See appendix, answer 55.

**32.** See appendix, answers 58 and 60. See also answer 30.

**33.** See text following note 20, *supra.*

**34.** See appendix, answer 27.

**35.** See note 14, *supra.*

**36.** See note 15, *supra* and accompanying text. See also note 17, *supra.*

**37.** Abrams' tortured attempts to explain the presence of these bills in the Henry file can be found in the appendix, questions and answers 37–53.

**38.** See appendix, answer 39.

**39.** See appendix, answers 52, 53. For examples of extremely evasive, if not literally false, answers regarding the photography bills, see appendix, answers 8–14.

**40.** See appendix, answer 15.

**41.** See appendix, answers 2, 18, 36, 48, 50.

**42.** See appendix, answer 33.

**43.** See, for example, answers 8, 9, 13, 20, 40. Likewise, some questions were framed in terms of what *would* occur, as opposed to what *did* occur. See, for example, questions and answers 14, 59. Under the standards announced in *Bronston v. United States,* 1973, 409 U.S. 352, 93 S.Ct. 595, 34 L.Ed.2d 568 and *United States v. Brumley,* 5 Cir., 1977, 560 F.2d 1268, discussed *infra* in connection with Count III, answers to such questions cannot form the basis of a perjury conviction.

looks many others.[44] This argument also ignores the settled principle that every answer set forth in a single count does not have to be false to sustain a conviction. *United States v. Bonacorsa,* 2 Cir., 1976, 528 F.2d 1218, 1221–22; *Stassi v. United States,* 5 Cir., 1963, 401 F.2d 259, 262, *vacated on other grounds sub nom. Giordano v. United States,* 1968, 394 U.S. 310, 89 S.Ct. 1163, 22 L.Ed.2d 297.

Second, appellant contends that there was no evidence introduced to show that she willfully and knowingly lied to the grand jury, that is, that she knew the charges were not incurred and remembered that fact. In this connection we are asked to ponder the thousands of cases which passed through, and the thousands of transactions taking place in, this busy, disorganized law office, all of which made it unreasonable for Abrams to remember the details of the Henry cost breakdown. There are several answers to this contention.

Abrams typed and signed on Davis' behalf the letters to the Florida Bar, and she—according to her grand jury testimony—prepared the cost breakdown. This office work was necessary only because a very serious complaint about Davis had been lodged with the Bar. Abrams was an employee in a law office where such complaints should not have been an everyday occurrence and should not have been treated routinely or cavalierly. All the more so because Abrams was well aware in April 1974 that Davis had been the target of a recent investigation. Indeed, that investigation prompted a meeting of Davis' staff which Abrams attended and during which Davis instructed the staff to take certain actions.[45]

In light of this background, the jury could have reasonably concluded that the Henry cost breakdown was not as forgettable as appellant contends and that Abrams knew full well that certain of her answers were false. This is especially so in light of the overwhelming evidence which could lead a jury to conclude that Abrams must have known or recalled that the $107.50 cost for investigation and photography was *never* incurred and that the $75 for conferences with Dr. Fox and the $35 for photographs were somehow fabricated in response to the Florida Bar inquiry.[46]

A similar argument was raised in *United States v. Chapin,* 1975, 169 U.S.App.D.C. 303, 515 F.2d 1274, 1284. In rejecting the sufficiency attack, the Court stated:

> [I]n the absence of a statement by the defendant, the falsity of an "I don't recall" answer must be proven by circumstantial evidence. This does not mean that proof is impossible. As another court has stated, "The jury must infer the state of a man's mind from the things he says and does. Such an inference may come from proof of the objective falsity itself, from proof of a motive to lie, and from other facts tending to show that the defendant really knew the things he claimed not to know" or recall. [Citations omitted.]

*Id.,* 169 U.S.App.D.C. at 313, at 515 F.2d 1284. In applying these principles, there was abundant proof—already detailed at length—of objective falsity and other facts tending to show that Abrams really knew or recalled that which she denied knowing or recalling. As to motive, the jury knew that Abrams was employed by Davis when she appeared before the grand jury and it was at liberty to draw reasonable inferences concerning motive from the employer-

---

**44.** See, for example, answers 2, 18, 33, 39, 48, 50, 60.

**45.** This investigation, which took place in September 1973, was apparently conducted by a local television station. Abrams' grand jury testimony concerning this staff meeting formed the basis of Count I as to which extensive testimony was given at trial, including what prompted the meeting.

**46.** It should be emphasized that several perjured answers did not involve "I don't know" or "I don't remember" responses. For example, Abrams stated unequivocally that the investigator prepared the Worldwide invoice for $107.50. The jury obviously believed Hallen's testimony to the contrary.

employee relationship, as well as from the grant of use immunity.[47] The jury, properly instructed, resolved this issue against Abrams and we see no reason to disturb its verdict here.

The third prong of Abrams' sufficiency attack relates to materiality. She urges that even if we hold her answers to be perjurious, they were not "capable of influencing the grand jury on the issue it was investigating; namely, whether Attorney James Davis was using the United States Mails to defraud insurance companies by 'ambulance chasing,' cooperating with doctors to increase medical bills to 'get over' Florida's Uninsured Motorist Statute threshold amounts and similar conduct." Appellant's brief at 50.

■ The test for materiality, as Abrams correctly concedes, is whether the false testimony was capable of influencing the tribunal on the issue before it. *E. g., United States v. Brumley*, 5 Cir., 1977, 560 F.2d 1268; *United States v. Damato*, 5 Cir., 1977, 554 F.2d 1371; *United States v. Parr*, 5 Cir., 1975, 516 F.2d 458. However, the statements need not be material to any *particular* issue but may be material to any proper matter of inquiry. *Damato, supra; United States v. Makris*, 5 Cir., 1973, 483 F.2d 1082;

*United States v. Gremillion*, 5 Cir., 1972, 464 F.2d 901; *Barnes v. United States*, 5 Cir., 1967, 378 F.2d 646.

The grand jury was investigating various allegations stemming from insurance claims. That body has substantial leeway in conducting its investigation. This Court has approved the following language from *United States v. Stone*, 2 Cir., 1970, 429 F.2d 138, 140:[48]

A grand jury's investigation is not fully carried out until every available clue has been run down and all witnesses examined in every proper way to find if a crime has been committed.

■ The questions seeking to determine whether costs deducted from Davis' clients' payments were actually incurred was·a proper subject of grand jury inquiry which resulted in the indictment of Davis and Fox for use of the mails to execute a fraudulent scheme. Abrams argues that Davis' clients were not the victims or complainants, that the insurance companies were, ergo, no materiality. Appellant's brief at 51. We are totally at a loss to understand this argument. Not only were the insurance companies victimized, but so were Davis' clients and the Florida Bar as well.[49] If the fabri-

47. The jury was instructed that it should carefully scrutinize the circumstances under which each witness testified and that it could consider each witness' intelligence, motive, and state of mind.

48. Quoted with approval in *United States v. Parr, supra*, 516 F.2d at 469.

49. Because this contention was made in the briefs and pressed so earnestly at oral argument, we checked the trial record in the Davis-Fox case, now on appeal in this Circuit. The indictment alleges a scheme and artifice to defraud and for obtaining money and property by means of false and fraudulent pretenses, representations and promises, from various insurance carriers, *accident victims, and the Florida Bar.* The alleged objects of the scheme were to (a) induce accident victims to institute claims against insurance carriers and to induce the carriers to pay claims to the defendants and their clients by submitting false and inflated medical bills; (b) *reduce payments to accident victims by deducting false and inflated medical bills and costs from the total amount of their settlements*; and (c) *defraud the Florida Bar*

*from conducting legitimate inquiries into matters raised by clients of Davis by preparing and submitting to the Florida Bar false and inflated justifications for cost.* Two of the false and fraudulent statements and representations cited in Count I of the Davis-Fox indictment were the breakdown submitted to the Florida Bar (Count III of the Abrams indictment) and the court reporter charges listed in the Eduardo Valdez case (Count II of the Abrams indictment, Section I–B *infra*). Counsel for Abrams stated, *inter alia*, at oral argument, "In fact, Counts II and III which we're here on really didn't deal with the same issues that the grand jury was investigating. . . . The statements and the questions and the answers which the government has alleged to be perjurious are not material, were not material to the grand jury's investigation because they really didn't deal with the issue of insurance fraud per se but rather it was a separate matter involving the client and the attorney." Any doubts as to materiality that we may have entertained because of these arguments and our ignorance of the true facts have been completely dispelled by our study of the Davis-Fox indictment.

cation and inflation of medical and other costs were part and parcel of an illegal scheme to obtain money and property by false representations, the grand jury was authorized to explore every aspect of that scheme in an effort to determine whether a federal crime had been committed.

■ A subpart of the materiality argument is that Abrams' answers in no way "deterred, misled or otherwise influenced the grand jury from conducting and completing its investigation." Appellant's brief at 50. This contention misperceives the legal requirements regarding materiality. The government need not show that because of the perjured testimony, the grand jury threw in the towel. Actual impediment of the investigation is not required. *E. g., United States v. Makris, supra; United States v. Gremillion, supra.* Such a ridiculous rule would mean that the grand jury believed the witness and placed so much importance on his testimony that further inquiry was useless. Grand jurors are capable of judging credibility and they are free to disbelieve a witness and persevere in an investigation without immunizing a perjurer. All the law requires is that the witness' answers were capable of influencing the tribunal on the issue before it, including any matters collateral thereto. The answers analyzed above easily passed that test and the Trial Court's finding and instruction on materiality were proper.

■ Finally, Abrams complains that the government failed to place before the jury evidence of materiality. This complaint is frivolous. One way in which the government can meet its burden on this score is by introducing the transcript of the prior proceeding. *See Damato, supra,* 554 F.2d at 1373 and cases cited in note 3. To paraphrase what one Court stated, the best way to know what the grand jury deems material is by reading what it asked about. *United States v. Sweig,* S.D.N.Y., 1970, 316 F.Supp. 1148, 1164. Not only was the entire transcript of all three Abrams' grand jury appearances introduced at trial, but the jury additionally had before it the Abrams indictment which set forth the factual basis [50] for the Trial Judge's finding and instruction on materiality as required in this Circuit. See *Brumley* and *Damato, supra.*

### B. Count III: The Eduardo Valdez Case

Eduardo Valdez, like Yva Henry, was a client of Davis. The Valdez "charge sheet," [51] Gov't Ex. 15, shows the costs incurred in his behalf. Under the heading "COURT REPORTERS," the following handwritten entries appear:

| | | Date | Check No. | Amount |
|---|---|---|---|---|
| [1] | Castillo & Castillo | 4/10/75 | 1831 [52] | 87.40 |
| [2] | Jack Besoner & Associates | 5/19/75 | 1897 [53] | 80.00 |

As to item [1], check # 1831 was actually drawn for $75.70, *not* for $87.40. Richard Castillo testified that the check was received in payment of an invoice (Gov't Ex. 17) for court reporting services in connection with the case of *Slater v. Faucett.* In regard to item [2], check # 1897 was actually drawn for $11.25, *not* for $80.00. Moreover, Besoner's ledger sheet, Gov't Ex. 18, shows that this check covered court reporting services in connection with the deposi-

---

**50.** Count II read in part as follows:

2. At the time and place aforesaid the Federal Grand Jury was conducting an investigation into various allegations stemming from insurance claims filed by the law offices of James A. Davis, II. These claims for damages were made on behalf of people involved in vehicular accidents who were represented by the Davis law firm. Settlements of accident claims would be negotiated by personnel at Davis' office and insurance drafts would be issued jointly to the client and James A. Davis, II. Payment would be made by Davis' office to the accident victim based on the amount of settlement after deducting attorney's fees, medical expenses and miscellaneous costs.

3. It was a matter material to said investigation to determine whether the expenses and costs deducted were actually incurred.

**51.** For an explanation of this term, see note 23, *supra.*

**52.** The check and the check stub were received in evidence as Gov't Ex. 16A.

**53.** The check and the check stub were received in evidence as Gov't Ex. 16B.

tion of Jones in the case of *Clark v. Jones*. Apparently neither of these two depositions had anything to do with the Valdez case.

The following Abrams testimony is the subject of count III:

Q.1 Now, looking at Grand Jury Exhibit No. 2, do you recognize the handwriting?

A.1 Yes.

Q.2 Whose handwriting is that?

A.2 Mine.

Q.3 All that handwriting?

A.3 Yes.

Q.4 You have depositions listed there.

A.4 Yes.

Q.5 That's your handwriting, also?

A.5 Yes.

Q.6 In cases when you charge for a deposition like that did the particular client have a deposition taken?

A.6 Yes.

Q.7 And they would be—would you have somebody, a court reporter there to take down what they said?

A.7 I wouldn't be aware—I wouldn't be there when the court reporter was there.

Q.8 But there would be a cost?

A.8 Yes.

Q.9 Who would give you that cost? How would you know what to charge for a particular item like that?

A.9 I would get a bill.

Q.10 From whom?

A.10 From the court reporter.

Q.11 Then you'd take that bill.

On the bill would it say the deposition or the particular work that was done on that?

A.11 Yes.

Count III alleges the following violation:

The aforesaid testimony of Anita Abrams as she then and there well knew and believed, was false in that she had prepared the charge sheet in case number

5469 on Eduardo Valdez which reflects that check number 1897 dated May 19, 1975 in the amount of $80.00 was paid to Jack Besoner and Associates for court reporter costs which she knew did not accurately reflect the costs; all in violation of Title 18, United States Code, Section 1623.

 While it is undoubtedly true that the Valdez charge sheet did not accurately reflect the costs, it is clear that Abrams was never asked whether and never stated that the charge sheet did accurately reflect the costs. Indeed, careful scrutiny of these answers in light of *Bronston v. United States*, 1973, 409 U.S. 352, 93 S.Ct. 595, 34 L.Ed.2d 568 reveals that none of these answers is literally false. *Bronston* stands for the proposition that the federal perjury statute, 18 U.S.C.A. § 1621, is not violated when a witness gives an evasive, nonresponsive but literally true answer, even if the answer is intentionally misleading and arguably false by negative implication.[54] Moreover, *Bronston* expressly places on the questioner the burden of pinning the witness down to the specific object of the inquiry. Chief Justice Burger wrote, "Precise questioning is imperative as a predicate for the offense of perjury." 409 U.S. at 362, 93 S.Ct. at 602, 34 L.Ed.2d at 576.

 As to the specific answers contained in Count III, there is no indication in the record that answers 1–5 are false. Questions and answers 7–11 are framed in terms of what Abrams "would do" as a matter of normal office routine and there is insufficient evidence in the record to support a conclusion beyond a reasonable doubt that these answers are false. None of questions 7–11 asks specifically what Abrams actually did with respect to the Valdez case. The only question which comes even close to asking directly about Valdez, by use of the verb "did" instead of "would," is No. 6: "*In cases* when you charge for a deposition

---

**54.** Making false material declarations before a grand jury is a species of perjury. *United States v. Gross*, 3 Cir., 1975, 511 F.2d 910, 915. *Bronston*'s requirements of literal falsity for § 1621 convictions are applicable to § 1623

offenses. *See United States v. Slawik*, 3 Cir., 1977, 548 F.2d 75, 83, *cited with approval in United States v. Brumley*, 5 Cir., 1977, 560 F.2d 1268, 1275.

*like that* did the particular client have a deposition taken?" (Emphasis added.) This question suffers an infirmity similar to those in questions 7–11, namely, it inquires about cases (plural) "like that", *not* about the Valdez case in particular.[55] There is insufficient evidence in the record to support a conclusion beyond a reasonable doubt that Abrams' affirmative response to question No. 6, indicating that in cases like that a deposition was taken, is false. Because the questioner failed, for whatever reason, to pin Abrams down on these charges and asked instead general hypothetical questions,[56] Abrams' conviction on Count III must be reversed. Since there is no way at this point for the government to cure the questions' defects, a judgment of acquittal must be entered on Count III. *Brumley, supra,* 560 F.2d at 1277.

## II. *Fair Trial*

■■■ Abrams contends that her Fifth Amendment due process right to a fair and impartial trial and her Sixth Amendment right to effective assistance of counsel were violated by the Trial Judge's conduct which prejudiced the defense in the eyes of the jury. As examples of a biased attitude against the defense, appellant cites nine incidents in the presence of the jury and six in its absence. These incidents fall generally into four categories: (i) interjection into the examination of witnesses; (ii) unjustified criticisms and rebukes of defense counsel; (iii) challenging defense questions without the government interposing an objection; and (iv) generally hostile remarks to defense counsel.

Appellant relies primarily on this Court's decision in *United States v. Candelaria-Gonzalez,* 5 Cir., 1977, 547 F.2d 291, in which disparagement, correction, and interruption of defense counsel was one factor which led to reversal of the conviction.[57] The record does indicate that the trial court exhibited some irritation with defense counsel. But under the standards carefully laid down by Judge Simpson in *Candelaria-Gonzalez,*[58] we are convinced that conduct of the trial did not rise to the level of a constitutional violation of Abrams' rights.

First, the most questionable instances occurred out of the presence of the jury,[59] and the challenged actions before the jury,

---

**55.** We should also point out that nowhere in questions 6–11 is Valdez's name mentioned and nowhere is the word "accurately" used.

**56.** For an affirmative answer to question No. 6 to have been perjured, the interrogator would have had to frame the question precisely and directly, for example, by asking, "When you charged the Castillo and Besoner invoices to Valdez, had the depositions in fact been taken in connection with his case?" Or, "Does the Valdez charge sheet accurately reflect court reporter charges that were actually incurred in the Valdez case?"

**57.** [W]e view as a serious impropriety the trial judge's failure to preserve an appearance of impartiality.

But we base our decision to reverse on the conduct of the trial as a whole. We do not find it necessary to decide whether the trial judge's behavior standing alone was sufficiently prejudicial to require reversal. 547 F.2d at 297–98.

**58.** A trial judge must exhibit neutrality in his language and in the conduct of a trial before a jury. He should avoid any possibility of prejudicing the jury through his criticism of or hostility toward defense counsel. . . . Of course a trial judge is not required to remain silent and passive throughout a jury trial. To the contrary, he has a duty "to participate directly in the trial, and to facilitate its orderly progress and clear the path of petty obstructions. It is his duty to shorten unimportant preliminaries, and to discourage dilatory tactics of counsel." . . . But in performing this duty he must make every effort to preserve the appearance of strict impartiality. "The opinion of the judge, on account of his position and the respect and confidence reposed in him and in his learning and assumed impartiality, is likely to have great weight with the jury, and such fact of necessity requires impartial conduct on his part. . . . "[T]he judge is a figure of overpowering influence, whose every change in facial expression is noted, and whose every word is received attentively and acted upon with alacrity and without question." [Citations omitted.] *Id.* at 297.

**59.** It might have been more troublesome had the following exchanges occurred in front of the jury:

MR. HIRSCHHORN: I have another case that is a more recent case with respect to perjury. It is the Lasater case. It's an Eighth Circuit case which says the false declarations

viewed as a whole, simply do not amount to intervention which could have led the jury to a predisposition of guilt by improperly confusing the functions of judge and prosecutor. *United States v. Gomez-Rojas*, 5 Cir., 1975, 507 F.2d 1213, 1223–24.[60]

in question must tend to influence, mislead or hamper the Grand Jury investigation.

THE COURT: Mr. Hirschhorn, this is not the first hearing we have had. We have had three other hearings. *I urged you all of the time to give me the cases upon which you rely so I can make an investigation. You spring a thing like this on me at the last moment.* The motion is denied.

At two o'clock, start putting on your case.

MR. HIRSCHHORN: If I might, Judge, with all due respect—

THE COURT: *With all due respect to this court, it seems to me that you ought to abide by the rulings of the court and when I asked you to give me your decisions and your authorities, you ought to do it. That would really give your client a break because then if you have a good point, I would have been able to check it.*

MR. HIRSCHHORN: Judge, as a practical matter, with all due respect, there is a tactical decision I have made in this case on the point I was about to argue. I don't care to give the government the benefit of my theory of the defense. I don't think I'm required to under the Fifth Amendment. I don't think I'm required to—

THE COURT: The motion is denied, Mr. Hirschhorn. You will be here at two o'clock. Who are you going to call as your witnesses?

MR. HIRSCHHORN: Your Honor may I just give the court one case to read?

THE COURT: I'm not going to be able to read it now, Mr. Hirschhorn. I have to eat. I have to work on the case.

MR. HIRSCHHORN: I'm going to work on the case too. I'm not going to eat.

THE COURT: Tell me who your first witness is going to be?

MR. HIRSCHHORN: I'm not certain.

THE COURT: *You are not going to call any witnesses are you?*

MR. HIRSCHHORN: I'm not certain whether I will or not.

THE COURT: Two o'clock.

MR. HIRSCHHORN: If the court please, may I give the case to your clerk?

THE COURT: *Yes. I don't like to be kidded, Mr. Hirschhorn. I didn't believe you were going to put on your witnesses in the first place. You put down Mr. Davis. You are not going to call him.*

MR. HIRSCHHORN: He's been subpoenaed, Your Honor.

THE COURT: The court will be in recess until 2:00 p.m.

Tr. 123–25 (emphasis added). Davis, as noted earlier, did testify for the defense.

This colloquy took place after the jury retired:

MR. HIRSCHHORN: Your Honor, I have a couple of matters in anticipation of an adverse verdict. First, I respectfully request the maximum time allowable within which to file a motion for new trial and renew motions under 29(c).

THE COURT: *She will be in jail anyway.* It wouldn't make any difference. You can have as much time as you want.

MR. HIRSCHHORN: The second issue, Judge, in the event there is a guilty verdict, will the court remand her at that time?

THE COURT: I think so.

MR. HIRSCHHORN: Well, there is no risk of flight here.

THE COURT: I don't know whether there is or not. What does the government say? I think there is.

MR. HIRSCHHORN: I might say, Judge, it will be the second time in six years of my Federal criminal cases I have had a defendant remanded pending a presentence.

THE COURT: *Mr. Hirschhorn, you're not running this court.*

MR. HIRSCHHORN: I know.

THE COURT: I just want to let you know that.

MR. HIRSCHHORN: I'm well aware of that.

THE COURT: *Apparently you have been trying to all of the time.*

MR. HIRSCHHORN: Well, I am well aware of that. That's why I asked the government first. In fact, I told the government you would probably remand her. But I would like to have a hearing on the issue of whether remand is really necessary.

THE COURT: We will have it in the next few days. *I will order the defendant taken into custody right now pending the return of the verdict. I don't want you to start trying to push me around. I don't like that, Mr. Hirschhorn.*

Tr. 222–24 (emphasis added).

**60.** The following are typical examples.

(1) When defense counsel asked for a short recess to discuss a stipulation (at that time the parties were awaiting the arrival of government witnesses), the Court stated:

Remember I asked you to do that in advance of the trial. There are twelve people here waiting. We are going to take a recess. This is the last time we are going to do it.

Tr. 20.

(2) When defense counsel asked for Jencks material, the court stated, "You were supposed to be here at seven o'clock this morning and pick that up." Tr. 57. Apparently the Court was unaware that counsel had arranged to meet and exchange this material at a more ordinary hour the day before, at which time

Second, the Court instructed the jury that (i) it was not to assume from his questioning of a witness that he had any opinion on the matter to which the questions related; (ii) it was not to draw any inference against the side to whom an admonition may have been addressed; (iii) it should disregard any opinion of his as to the facts; and (iv) it was the sole judge of Davis' credibility despite the court's remarks aimed at putting a stop to repetitious testimony by Davis.[61] Third, defense counsel conceded at oral argument that the Judge's behavior did not prevent him from conducting the defense as he ordinarily would have. Fourth, the defense was not the sole target of the Judge's dissatisfaction; the Court demonstrated some pique toward the government as well. *See United States v. Bridges*, 5 Cir., 1977, 551 F.2d 651; *Duran v. United States*, 9 Cir., 1969, 413 F.2d 596, 600. Fifth, and most significant, the acquittal of Abrams on Count I further negates any claim that the jury was affected by the Judge's allegedly biased attitude. *United States v. Bridges, supra.*

■ While we do not condone a Trial Judge's disparagement of the advocates appearing before him, in the final analysis, the question whether prejudicial trial court conduct reaches constitutional magnitude is a matter of degree. In light of all the factors enumerated above, we do not believe that, standing alone, the court's handling of the trial so prejudiced the defense in the eyes of the jury as to warrant reversal on Fifth or Sixth Amendment grounds.

### III. Failure To Grant Mistrial

■ The government called as a witness Sgt. Paul Janowski who had assisted in executing the search warrant of Davis' office.[62] When asked by whom he was employed, Janowski responded, "Dade County Organized Crime Bureau." Defense counsel immediately objected and moved for a mistrial, stating that the answer was prejudicial. The motion was summarily denied.

Abrams urges that this answer improperly permitted the jury to infer that she was in some way linked to organized crime or the Mafia, resulting in prejudice that requires reversal. Alternatively, appellant contends that the trial court's conduct, taken together with the denial of the mistrial motion, should result in reversal as in *Candelaria-Gonzalez, supra.*[63] We disagree.

Defense counsel conceded at oral argument before us that Janowski in fact worked for the Dade County Organized Crime Bureau. The answer was therefore

some documents had inadvertently been omitted.

(3) This exchange occurred during the examination of Mr. Gross of the Florida Bar:

Q You said it is not unusual to get hundreds of these complaints?

A I get hundreds of complaints.

Q From clients who think it is unfair that lawyers—

A That's right.

Q Who handle their cases on a contingency basis and wind up getting as much or more than they do?

A Well, I don't know.

THE COURT: How is that going to prove or disprove any issue in this case? What is the relevancy of that?

MR. HIRSCHHORN: I didn't hear the government object.

THE COURT: That doesn't give you the privilege of asking irrelevant questions.

MR. HIRSCHHORN: I have a theory in the case. I believe it is relevant.

THE COURT: Tell me the theory of the case.

MR. HIRSCHHORN: Judge, I believe that the government—the jury is entitled to know, this is not an isolated incident involving one particular lawyer.

THE COURT: That doesn't make any difference. That has absolutely no relevancy on whether this woman committed perjury or not. This is what we are here to determine, whether she was asked certain questions and whether she wilfully told falsehoods. That is the issue in this case. It is not the question of whether the lawyers or doctors overcharged or whether they engaged in ambulance chasing or anything else. The question here is whether this woman committed perjury.

Tr. 68–69.

61. *Candelaria-Gonzalez* is silent as to whether such curative instructions were given. For a case where the giving of instructions was a factor in finding no prejudice, see *Duran v. United States*, 9 Cir., 1969, 413 F.2d 596, 600.

62. See note 6, *supra.*

63. See section II.

truthful. Appellant also concedes that it is customary to have witnesses state where they are employed. In addition, we are compelled to ask one question: if the answer had in fact infected the jury in the manner suggested, why would it have acquitted Abrams on Count I? Moreover, the jury was instructed more than once that the *sole issue* before it was whether Abrams deliberately lied to the grand jury and that nothing she did in Davis' office by way of over- or undercharging a client was relevant. Another factor negating likely prejudice is the jury's possession during its deliberation of all Abrams' grand jury testimony in which there was not one shred of evidence linking Abrams or the Davis office to the Mafia or organized crime. The possibility that this one isolated answer—given in the context of the whole trial where there was not another word to show any connection to the syndicate—could cause a reasonable juror to jump to the conclusion that Abrams had any such connection is farfetched. We refuse to credit jurors with such active imaginations and so little common sense.

The Trial Judge did not abuse his discretion in denying the motion for a mistrial and the record, taken as a whole, fails to demonstrate that Abrams was denied a fair and impartial trial.

The conviction and sentence on Count II is affirmed. The conviction on Count III is reversed and a judgment of acquittal is to be entered on that count.

AFFIRMED IN PART and REVERSED IN PART.

### APPENDIX *

#### JULY 26, 1976 GRAND JURY TESTIMONY OF ANITA ABRAMS SET FORTH IN COUNT II OF THE INDICTMENT

Q.1 The message, according to the notation, says "Anita space Eva Henry costs space $231.50 space wants breakdown," and gives the case number.

Now, after you received this telephone message, did you obtain a breakdown of these costs?

A.1 Yes, I did.

Q.2 Where did you get that from?

A.2 *From our cost sheet and the cards that the accountant would have.*

Q.3 Now, what has been marked as page two of this item, which is a letter dated April 1, 1974, do you recognize that?

A.3 Yes, I do.

Q.4 Do your initials appear as the typist on this?

A.4 Yes.

Q.5 Attached to that is a breakdown of the costs on Eva Henry, is that correct?

A.5 Yes.

Q.6 Now, on this charge sheet, on Eva Henry, as attached to this letter to the Florida Bar list is, first of all, well it lists a number of minor charges such as $3 for accident report, $6 Westchester General Hospital medical records, Jackson Memorial Hospital medical records, I believe that's a total of $14 right there.

Then there's also a charge here for $35 for photographs.

Now, this request came in and this letter was sent out on April 1, 1974.

Do you recognize this copy of a bill which appeared in the Eva Henry file which is page number three of that exhibit which is a bill for film?

A.6 Yes, I do.

Q.7 Dated April 2, 1974.

Do you recognize that?

A.7 Yes, I do.

Q.8 Do you recall the circumstances under which that bill was obtained?

A.8 I know that the investigator, Dave Hallen, would take photographs and bill us for that.

Q.9 After the case was closed?

A.9 Well, sometimes a bill is not submitted until after the case is closed.

---

\* Numbers and italics have been added for easy reference.

Q.10 But this is not a bill from Mr. Hallen.

This is a bill for film.

A.10 He would have paid that bill himself.

Q.11 He wouldn't have paid it until like a year after the case was closed?

A.11 No.

What I'm saying is he would pay it out of his own pocket and collect it from the office.

Q.12 When would he pay it?

A.12 When he gets it.

Q.13 Why he would be getting a bill for film on the Eva Henry case the day after the letter from the Florida Bar comes in asking for a breakdown on costs?

A.13 I wouldn't know what he would do.

All I know is that sometimes, before the case is—he would pay a bill before and submit it to us after.

Q.14 Now, this amount that you have here, $35 for photographs, which, apparently, is based on a bill for film and a copy of a cover envelope from the developing company also dated April 2, 1974, now these two amounts, which constitute the bill for $35 on photographs, where you would have gotten the bill for film or a bill for photographs prior to receiving these two items?

A.14 From Dave Hallen.

* * * * * *

Q.15 Isn't it true, Miss Abrams, that after you received a letter from the Florida Bar or a note from the Florida Bar asking for a breakdown of costs, that these items, the bill for film and the bill for photographs, were obtained the day after so that you would have something in your file to justify that cost?

A.15 *Not to my knowledge.*

Q.16 All right.

You said you did type up this letter to the Florida Bar, right?

A.16 Yes, I did.

Q.17 You did type up this charge sheet on Eva Henry?

A.17 Yes, I did.

Q.18 Where did you get the figures from this that appear on the charge sheet?

A.18 *From what I have on my own charge sheets on what was on the charge cards.*

Q.19 You didn't use the journal entries, then?

A.19 Not for the charge cards.

Q.20 No.

I didn't ask for the charge cards.

I asked for this letter.

I asked, what records did you use to prepare this charge sheet which was submitted to the Florida Bar on Eva Henry?

A.20 Well, I would get it from a charge sheet, like the one that's here on Valdez, and if there was a charge card that the accountant would have.

* * * * * *

Q.21 Now, listed on this charge sheet of Eva Henry is a charge of $107.50 for investigation in photography.

Now, where would you have gotten that amount from?

A.21 From Dave Hallen.

Q.22 Okay.

You didn't get it from Dave Hallen when the Florida Bar asked for a breakdown, did you?

A.22 Probably did.

I don't recall exactly when I got it from him.

Q.23 Your case was closed by then, right?

A.23 I don't remember exactly when it was closed and when there was a letter from the Florida Bar.

Q.24 This charge—closing statement that you referred to before has a listed cost on here of $231.50 and part of that cost is, supposedly, made up by this charge of Mr. Hallen for a hundred and seven dollars, is that right?

A.24 Yes.

Q.25 Now, when you prepared this, which was prepared prior to the time that Miss Henry made her request to the Florida Bar, where did you get the figure of a hundred and seven dollars from for investigative services?

A.25 *Dave Hallen.*

\*　　\*　　\*　　\*　　\*　　\*

Q.26 . . . Now this thing on Yva Henry here, on what has been marked as Government's Exhibit No. 9, which, first of all, contains a message of a phone call to you that we've gone over before, saying "Anita, Yva Henry, costs, $231.50, want breakdown," gives the case number is there a little notation off to the side here saying, "Photographs, ten at $3.50, $35 AR" which I assume is accident report, "$3, WR," which I assume is Westchester report, "$6, JMH," which I assume is Jackson Memorial Hospital, "$5."

Giving us a total of $49.

Then underneath that is another entry for $75 giving us a total entry of $124.

Then underneath that, Miss Abrams, is another entry wherein you put down the amount of costs, $231.50 and you subtract that amount you have up here, $124 to arrive at another figure.

Could you please tell me what you were doing there?

A.26 It looks like I was subtracting $124 from $231.50.

Q.27 Why would you be doing that?

You testified, when you made up the amount of costs, you would just go to these various places and get all the costs and add them up and arrive at a cost.

Why would you be subtracting $124 from what the total cost is listed on the sheet?

Why wouldn't you be adding up all the costs?

A.27 Well, *I don't remember.*

*I don't know what I was doing.*

*I can't remember what I was doing there.*

I can see I was subtracting that but I don't know why.

*I can't remember what I was doing.*

Q.28 You can't explain this?

A.28 I know I did subtract it.

Q.29 You're the bookkeeper.

Can you think of any reason you would be doing it that way?

A.29 *I really don't remember.*

I know I was subtracting it but—

\*　　\*　　\*　　\*　　\*　　\*

Q.30 (By Ms. Lyons) So you're saying Mr. Hallen brought this bill into your office; is that right?

A.30 *I think he did.*

\*　　\*　　\*　　\*　　\*　　\*

Q.31 Now, this is a bill for services dated May 17, 1973.

Now it's listed in the name of Worldwide Detective Agency.

Who would the check have been made to?

A.31 Dave Hallen.

Q.32 Were all bills from Worldwide Detective Agency paid to Dave Hallen directly?

A.32 Yes.

\*　　\*　　\*　　\*　　\*　　\*

Q.33 (By Ms. Lyons) Miss Abrams, when you got this request from the Florida Bar for a breakdown on the Yva Henry case, isn't it true that you went back through your books to try and find the check that had been written to someone in an amount you could fill in the blanks on this and thus justify the cost of $131.50?

A.33 *No, I did not.*

\*　　\*　　\*　　\*　　\*　　\*

Q.34 When you figured out the cost, how did you figure out this entry, or whatever it is, in this book, or in this book, that $107.50 of that was attributable to investigation and Yva Henry when it doesn't say $107.50 is for Dave Hallen?

A.34 Because his sheet would have it.

Dave Hallen has always—almost always supplies bills for his services and he would have cases on that sheet.

I would post it accordingly as such.

Q.35 Post it where?

A.35 On the chart sheet.

Q.36 So you're saying that you prepared this amount for the Florida Bar based upon your charge sheet in the Yva Henry case?

A.36 *Yes.*

\* \* \* \* \* \*

Q.37 Why wouldn't you have these bills in your file until April 2, 1974 and why wouldn't the cost be incurred until April 2, 1974 if his investigation was allegedly done in May of 1973?

Didn't you direct to have these photographs prepared at that time when this inquiry from the Florida Bar come about?

A.37 I didn't.

I never directed Dave Hallen to do anything, the attorneys would.

Q.38 Did the attorney do that in this case?

A.38 Not to my knowledge, no.

Q.39 Didn't these bills just appear in the file after that call from the Florida Bar?

A.39 *I know that the bills were Dave Hallen's.*

*He had them.*

I never paid them directly.

He may have requested copies.

Q.40 Where did this come from?

A.40 It would come from him.

Q.41 In April of 1974, the day after the request from the Florida Bar?

A.41 Well, I don't know where we got them or when he got them but he may have asked for copies of the bills.

He may not have kept them.

He may have requested copies of the bills the—

Q.42 You said he submitted the bills to you and that you based your payments to him on bills he submitted to you.

Why would he have been requesting copies of bills from you?

A.42 Not from me, from the photography company.

Q.43 Why would it be in your file?

A.43 He may have been asked to produce the bills.

Q.44 By who?

A.44 By the attorney.

Q.45 What attorney?

A.45 I don't know who worked on the file or gave instructions on it.

Q.46 Mr. Davis is the one signing the letter to the Florida Bar with the breakdown of costs?

A.46 Yes.

Q.47 This breakdown of costs was prepared by you, is that correct?

A.47 Yes.

Q.48 And you said that those costs all came from the cost statement that you had prepared as this case went along?

A.48 *That's right.*

Q.49 All right.

This breakdown of costs to the Florida Bar, then, you deny was based on these photographic bills which did not come into your office until April of 1974?

A.49 I don't understand.

What's the question.

Q.50 You're saying that the breakdown to the Florida Bar was based purely on your cost statement?

A.50 *Yes.*

Q.51 And you said that you recorded costs on your cost statement as they were incurred?

A.51 Yes.

Q.52 Therefore the cost statement would not contain any bills such as these which were not submitted into your office until April 2, 1974.

A.52 What I'm saying is that *Mr. Hallen may have paid them and we repaid him and he may have requested copies of the bills because we didn't have those to substantiate his payment.*

The payment that he received.

He may have got it after.

*I don't know.*

*I don't remember the exact circumstances.*

Q.53 You do not know the circumstances under which this photographic bill, dated April 2, 1974, and this envelope containing negatives of photographs dated April 2, 1974, and contained in the Yva Henry file, you do not know the circumstances under which these items were contained?

A.53 *No.*

*I do not.*

Q.54 Also the bill for the conference with Dr. Fox, two conferences with Dr. Fox in April of 1973 and in June of 1973, do you also deny that you know the circumstances under which this particular bill was prepared?

A.54 *I do.*

Q.55 Also this bill from Worldwide Detective Agency dated May 17, 1973, in the amount of $107.50.

Do you know the circumstances under which this bill was prepared.

A.55 *I know that bill was prepared by the investigator* and it was paid to him.

Q.56 When?

A.56 I don't know.

Q.57 Would that bill have been submitted on/or about May 17, 1973?

A.57 It's possible but I cannot say for sure.

Q.58 Would it have been submitted prior to the time that this amount was deducted from the client's settlement payment?

A.58 I do not remember when it was submitted.

*I know it was submitted* and paid but I cannot remember when or what day or what.

Q.59 Would you have charged the client for this amount if you did not have a bill on it?

A.59 No.

Q.60 You're saying this bill was submitted to your office sometime prior to the settlement in the Yva Henry case?

A.60 *Yeah.*